UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re:<br><br>Christopher E. Fletcher<br><br>Debtor. | ) | Case No. 14bk18583<br><br>Chapter 7 |
| John D'Aguanno,<br><br>Plaintiff,<br><br>v.<br><br>Christopher E. Fletcher and Laura Spretnjak,<br><br>Defendants. | ) | Adversary No. 20ap00332<br><br>Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION[1]

The matter before the court comes on for consideration on the Fourth Amended Adversary Complaint [Adv. Dkt. No. 153] (the "Complaint"), filed by John D'Aguanno (the "Plaintiff"), in both the above-captioned adversary case (the "Adversary"), as consolidated with removed adversary and referred proceeding titled as *D'Aguanno v. Spretnjak*, Adv. Pro. No. 22ap00049 (Bankr. N.D. Ill. by order of referral on Mar. 28, 2022) (the "Removed Case").[2] The Complaint seeks, pursuant to section 523(a)(2)(A) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code"), a determination of nondischargeability of debt allegedly owed to the Plaintiff by

---

1 This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure (the "Civil Rules" and, as to each, "Civil Rule ___"), made applicable to these proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and, as to each, "Bankruptcy Rule ___"). A separate judgment will be entered pursuant to Bankruptcy Rule 9021 and in accordance with Civil Rule 58(a), made applicable in these proceedings by Bankruptcy Rule 7058.

2 References to docket entries in this Adversary will be noted as "Adv. Dkt. No. ___." References to docket entries in the underlying bankruptcy case, *In re Christopher E. Fletcher*, Case No. 14bk18583 (Bankr. N.D. Ill. filed May 16, 2014) (Barnes, J.) (the "Chapter 7 Case"), will be noted as "Dkt. No. ___." References to exhibits in this Adversary will be noted as "Px. ___" (in the case of Plaintiff's exhibits) or "Dx. ___" (in the case of Defendant's exhibits), as applicable.

Christopher E. Fletcher (the "Debtor") and his spouse, Laura Spretnjak ("Spretnjak," and together with the Debtor, the "Defendants").

ISSUES PRESENTED

Though, as discussed below, the Complaint is a result of a series of amendments and dispositive motions, it is the complaint on which, in part, the parties proceeded to trial. The Complaint seeks relief in seven counts (the "Counts" and as to each, "Count __"), as follows:

Count I: That the debt allegedly owed by the Debtor to the Plaintiff be found exempt from discharge to the extent it was obtained by false pretenses under 11 U.S.C. § 523(a)(2)(A);

Count II: That the debt allegedly owed by Spretnjak to the Plaintiff be found exempt from discharge to the extent it was obtained by false pretenses under 11 U.S.C. § 523(a)(2)(A);

Count III: That judgment be entered in favor of the Plaintiff and against Spretnjak for breach of contract in an amount in excess of $100,000.00, plus interest as provided for by the terms of a Commercial Loan Promissory Note (Secured), Dx. 1, dated April 1, 2006, in the amount of $150,000.00, due December 31, 2006 (the "Note"), post-demand interest pursuant to 815 ILCS 205/2 and costs and reasonable attorneys' fees as provided for by statute and the terms of the Note;

Count IV: That judgment be entered in favor of Plaintiff and against Spretnjak for common law fraud in an amount in excess of $100,000.00, plus interest as provided for by the terms of the Note, post-demand interest pursuant to 815 ILCS 205/2 and costs and reasonable attorneys' fees as provided for by statute and the terms of the Note and for exemplary and punitive damages;

Count V: That the Plaintiff be found to be entitled to constructive trust on the subject assets, and the proceeds of such assets, conferred upon the Defendants in an amount to be proven at trial;

Count VI: That judgment be entered in favor of the Plaintiff and against both Defendants for common law spoliation in an amount in excess of $100,000.00, plus interest as provided for by the terms of the Note, post-demand interest pursuant to 815 ILCS 205/2 and costs and reasonable attorneys' fees as provided for by statute and the terms of the Note; and

Count VII: That judgment be entered in favor of the Plaintiff and against Defendant Fletcher for breach of contract in an amount in excess of $100,000.00, plus interest as provided for by the terms of the Note, post-demand interest pursuant to 815 ILCS 205/2 and costs and reasonable attorneys' fees as provided for by statute and the terms of the Note.

The Complaint presents serious jurisdictional issues to the court, each of which are discussed below and each of which affect how the court, if at all, can render judgment in this matter.

## JURISDICTION

Ordinarily, the court's recitation of jurisdiction, statutory authority and constitutional authority in decisions such as this is, while complex, relatively straightforward. As discussed below, this matter is anything but ordinary. Prior to this matter proceeding to trial, the court granted summary judgment on several counts. Order Granting in Part and Denying in Part Motion for Summary Judgment [Adv. Dkt. No. 148] (the "PSJ Order"). At that time, the court did not engage in a substantive analysis of its jurisdiction regarding this matter. Now, in considering the remaining counts, the court must address a complexity to the jurisdictional basis of the matters before it. That complexity extends to the counts on which summary judgment has previously been granted. As a result, the court must consider now its jurisdiction over all of the counts, not just those counts which proceeded to trial.

It is clear that the federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code. 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy courts for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A judge of the bankruptcy court to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Such judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the judge may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the judge may hear the matters but may not decide them without the consent of the parties. 23 U.S.C. §§ 157(b)(1), (c). For matters only related to a bankruptcy case, absent consent, the judge must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a judge of the bankruptcy court must also have constitutional authority to hear and determine a matter. *Stern v. Marshall*, 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy judge hearing and determining the matter. *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

The matter before the court poses difficulties to this framework for a number of reasons.

First, the Complaint repleads a number of counts that, as discussed below, were handled by the court on summary judgment. The parties appear to understand that such repled counts were not somehow revived as, for example, the Defendants on the Defendants' Pretrial Statement (defined

below) do not address the repled counts and the Plaintiff at trial did not appear to address them. Because this repleading of counts has resulted in a complaint that postdates the court's ruling on summary judgment that does not match the court's ruling or the parties' actions, the result is somewhat of a mess. For the sake of this jurisdictional analysis and because, as noted above, the court did not engage in an extensive consideration of jurisdiction when ruling on summary judgment, the court will address all of the counts in the Complaint as if they remain before the court.

Second, the Complaint brings a series of counts against a nondebtor without regard for the jurisdictional framework imposed on this court. Bankruptcy courts are courts of limited jurisdiction. *In re Sheehan*, 48 F.4th 513, 520 (7th Cir. 2022) (citing to *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995)). It is incumbent upon parties who wish to bring third party disputes before the bankruptcy court that such parties thoroughly explain how their requests fall within that limited jurisdiction. That was not done here. While the cause for that failure no doubt lies in the fractured manner in which multiple, revised complaints were submitted to the court, it is a failure, nonetheless. Nonetheless, as "[i]t has been the virtually universally accepted practice of the federal courts to permit any party to challenge or, indeed, to raise *sua sponte* the subject matter jurisdiction of the court at any time and at any stage of the proceedings," *Sadat v. Mertes*, 615 F.2d 1176, 1188 (7th Cir. 1980), the court considers below *sua sponte* the propriety of the nondebtor claims and its previous grant of summary judgment regarding the same.

Third, the Complaint seeks a monetary judgment against the Debtor on an allegedly nondischargeable claim. As explained by the court previously, *Handler v. Moore* (*In re Moore)*, 625 B.R. 896, 899 (Bankr. N.D. Ill. 2021), entering monetary judgments on nondischargeable debts is problematic. As stated there:

> An open question exists whether, on such a request, an Article I bankruptcy court can enter monetary judgment [on a nondischargeable debt]. The Seventh Circuit, in a case predating *Stern*, encouraged the bankruptcy court to do just that. *In re Hallahan*, 936 F.2d 1496, 1508 (7th Cir. 1991) (concluding that once a party submits itself to adjudication before the bankruptcy court, it submits itself to all that entails). Later, the Seventh Circuit appeared to question that conclusion. *Lee v. Christenson*, 558 Fed. Appx. 674, 676 (7th Cir. 2014) ("[I]t is unclear whether *Stern* ... restricts a bankruptcy court's power to resolve a creditor's state-law claim when the court decides whether that claim is nondischargeable.").
>
> Since then, encouragement similar to that in *Hallahan* has been given, but that encouragement was not unfettered. *Siragusa v. Collazo (In re Collazo*), 817 F.3d 1047, 1053 (7th Cir. 2016). There, the Seventh Circuit stated that a bankruptcy court hearing a section 523 matter "could have declined to award damages and instead remitted the creditors … to their state-court remedies." *Id.* at 1053. However, in that same opinion, the Circuit stated that the trial court should consider whether the parties might consent to the bankruptcy court's adjudication as permitted by *Wellness*. *Id.* at 1054.

*Id.* The court will return to this issue below.

First, though, it is helpful to consider the court's jurisdiction on a count-by-count basis.

At its heart, the Complaint is one opposing dischargeability of a debt under section 523(a)(2)(A) of the Bankruptcy Code. As such a complaint arises only in a bankruptcy case, Count I of the Complaint is expressly a core proceeding. 28 U.S.C. §§ 157(b)(2)(A), (B) & (I). In accordance with *Stern*, 564 U.S. at 499, a bankruptcy court judge has authority to decide matters of nondischargeability, as the dischargeability of a debt is necessarily a matter that would stem from the bankruptcy itself. "A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability." *In re Glenn*, 502 B.R. 516, 522 (Bankr. N.D. Ill. 2013) (Barnes, J.), *aff'd sub nom., Sullivan v. Glenn*, 526 B.R. 731 (N.D. Ill. 2014), *aff'd*, 782 F.3d 378 (7th Cir. 2015); *see also Chop Foo, LLC v. Justin S. Fara* (*In re Fara*), 663 B.R. 696, 707 (Bankr. N.D. Ill. 2024) (Barnes, J.); *Dragisic v. Boricich (In re Boricich)*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011) (Schmetterer, J.). While such actions may turn on state law, determining the scope of a debtor's discharge is a fundamental part of the bankruptcy process. *See Deitz v. Ford (In re Deitz*), 469 B.R. 11, 20 (B.A.P. 9th Cir. 2012). As observed by one bankruptcy court, "there can be little doubt that [a bankruptcy court], as an Article I tribunal, has the constitutional authority to hear and finally determine what claims are nondischargeable in a bankruptcy case." *Farooqi v. Carroll (In re Carroll*), 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011); *see also Dietz,* 469 B.R. at 20; *In re Boricich*, 464 B.R. at 337. As a result, the court has jurisdiction, statutory authority and constitutional authority to hear and determine Count I.

Counts II, III and IV are not so simple. In Count II, the Plaintiff seeks a determination of nondischargeability against Spretnjak, a nondebtor. Counts III and IV both seek monetary judgments in favor of Plaintiff against Spretnjak. As neither the Plaintiff nor Spretnjak is the debtor in the Chapter 7 Case, each of these Counts present a classic third-party dispute conundrum. *See, e.g.*, *In re Drs. Hosp. of Hyde Park, Inc.*, 308 B.R. 311, 316 (Bankr. N.D. Ill. 2004) (Doyle, J.).

As in *Doctors Hospital*, these claims by the Plaintiff against Spretnjak neither arise under the Bankruptcy Code nor arise in the Chapter 7 Case itself. They are, therefore, at best, related to the Chapter 7 Case or, if such jurisdiction exists at all, within the bankruptcy court's "supplemental jurisdiction." *Id.* at 316-318. There is no clear case (or any case at all, for that matter) made by the Plaintiff as to why Counts III and IV are related to the Chapter 7 Case. As *Doctors Hospital* points out, the Seventh Circuit has interpreted 'related to' jurisdiction very narrowly. *Id.* at 317 (citing to *Elscint, Inc. v. First Wisc. Fin. Corp.* (*In re Xonics, Inc.*)*,* 813 F.2d 127, 131 (7th Cir. 1987)). The Seventh Circuit in *Xonics* stated that "bankruptcy jurisdiction is designed to provide a single forum for dealing with all claims to the bankrupt's assets. It extends no farther than its purpose. That two creditors have an internecine conflict is of no moment, once all disputes about their stakes in the bankrupt's property have been resolved." *Xonics,* 813 F.2d at 131. The court agrees wholeheartedly with both *Doctors Hospital* and *Xonics* in this regard.

Regarding supplemental jurisdiction, however, the court does not agree with *Doctors Hospital*. In *Doctors Hospital*, the court concluded that the bankruptcy court may not exercise supplemental jurisdiction in any manner under 28 U.S.C. § 1367(a). *Doctors Hosp.*, 308 B.R. at 318. That conclusion appears to be based, in large part, on the Seventh's Circuit skepticism of such an ability as expressed in *Chapman v. Currie Motors, Inc.,* 65 F.3d 78, 81 (7th Cir. 1995). In turn, that skepticism appears to be rooted in a perceived conflict between sections 157 and 1367. *Id.* at 81 ("[T]his is mainly because it would step on the toes of the bankruptcy statute conferring 'related to' jurisdiction.").

The court fails to see the conflict. As any exercise of supplemental jurisdiction would be in the manner of 'related to' jurisdiction, it would be the District Court, not the bankruptcy court, that

would be in fact exercising supplemental jurisdiction on its *de novo* review of the bankruptcy court's recommendations. The bankruptcy court would be exercising a lesser role regarding supplemental jurisdiction and the Supreme Court in *Stern* expressly reserved on that very same ability. *Stern*, 564 U.S. at 480 n.4 ("We express no opinion on any of these issues …."). Any conflict in the statutes would be resolved by the subsequent Article III review of the bankruptcy court's findings and conclusions. The Supreme Court, in fact, has endorsed the use of the bankruptcy court's authority to issue proposed findings and conclusions as a solution to a statutory conundrum created by *Stern*. *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 37 (2014). Last, because, as discussed below, the Adversary consists both of the original Adversary and the consolidated Removed Case referred to this court by the District Court, the court can infer through such referral that the District Court has asked this court to make recommendations regarding the Plaintiff's claims against nondebtor Spretnjak, even where such claims would arise only under the District Court's exercise of supplemental jurisdiction. This is no different than the role played by an Article I magistrate judge on such matters.

Further, given that the claims against Spretnjak find their origin in the Removed Case, there exists an additional reason to conclude that the District Court asked this court to act in this manner. The removal statute makes clear that:

> A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

28 U.S.C. § 1452(a). However, once removed, the District Court may only transfer that matter to the bankruptcy court under the authority set forth in title 28. 28 U.S.C.§ 157(a) ("Each district court may provide that *any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11* shall be referred to the bankruptcy judges for the district.") (emphasis added). By referring the Removed Case to the bankruptcy court under the authorizing statute, the District Court thus implicitly determined that the Removed Case was related to the Bankruptcy Case. This court, having determined that it does not meet the categories set forth in that same section, 28 U.S.C. § 157(b), is left to craft a remedy in the manner implied by the Supreme Court to solve section 157(b) conundrums. *Arkison*, 573 U.S. 36–37. As in *Arkinson*, the gap created by the District Court's referral of the Removed Case requires filling and the court finds nothing in section 157 that indicates that Congress would prefer the bankruptcy court not make a recommendation to the District Court in the manner set forth in the statute. *Id*. at 37.

Here, where the parties have engaged in extensive motion practice relating to Counts II, III and IV without questioning this court's authority, they have certainly consented to this court's constitutional authority to hear such counts. *Wellness*, 575 U.S. at 669; *Richer*, 798 F.3d at 490. The matter meets the requirements of section 1367 in that such "claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). As a result, given that the exercise of supplemental jurisdiction would be by the District Court on review and not by this court, the court concludes that it has jurisdiction to hear each Count and make recommended findings of fact and conclusions of law to the District Court on Counts II, III and IV.

In that regard, the parties' extensive motion practice resulted in summary judgment in favor of Spretnjak on Counts II, III and IV. PSJ Order, p. 7. To force the parties to retry the issues at this stage would be entirely inequitable.

Perhaps the solution lies in a more expansive reading of what is "related to" the Chapter 7 Case. But that would seem at odds with the narrow reading prescribed by the Seventh Circuit's decision in *Xonics*. *Xonics,* 813 F.2d at 131. Perhaps the solution lies instead in recognizing that the scheme set forth in section 157 of title 28—one first created by the Article III courts and later implemented by Congress solely to assuage the Article III courts' concern that the bankruptcy court was usurping their authority—is a procedural statute and not a jurisdictional one. The bankruptcy courts' jurisdiction is set forth in section 1334, not section 157. Section 1334, of course, contains "related to" limitations considered in *Xonics*. 28 U.S.C. § 1334(b). The Supreme Court's fix in *Arkison* was, after all, applied to section 157, the procedural rule, not the jurisdictional one.

So, the solution appears to be a combination of both. A broader reading of "related to" jurisdiction in these limited circumstances hardly upsets the balance between the Article I and Article III courts. After all, the solution from *Arkison* is one of ultimate deference to the Article III courts. It is the District Court, not the bankruptcy court, which will ultimately be the court to exercise the supplemental jurisdiction in question. Here, where the parties have either actively consented or been oblivious to the court's jurisdiction in this matter and have spent time and money litigating these issues through various stages (which efforts would need to be replicated in another court at great cost and little benefit to all), the expeditious solution is to follow the guidance of *Arkison* and ask the District Court to act. As the Seventh Circuit's skepticism in *Chapman*, which skepticism formed the basis of the ruling in *Doctors Hospital*, predates the Supreme Court's reservation in *Stern* and later solution in *Arkison*, the court finds no reason that the summary judgment should not be transmitted to the District Court for it to review the matter *de novo* and exercise, as appropriate, its supplemental jurisdiction regarding the same.

The court will therefore, as discussed below, recommend to the District Court that it exercise its supplemental jurisdiction and enter judgment accordingly.

As to Count II, which as discussed below initially sought judgment against Spretnjak on the issue of nondischargeability but was later was amended to assert claims against Spretnjak for false pretenses, the court concluded that the former claim was not justiciable and the latter was time-barred. PSJ Order. As to the former, while the court recognizes that the tortuous series of amendments to the Complaint described later in this Memorandum Decision was, in part, driven by the singular nature of the Supreme Court's ruling in *Bartenwerfer v. Buckley*, 598 U.S. 69, 77 (2023), *Bartenwerfer* does not appear to be intended to extend the bankruptcy court's limited jurisdiction. *Bartenwerfer* stands solely for the proposition that a debtor may not escape liability for a fraudulently incurred debt by arguing that the debtor was innocent of the fraud. *Bartenwerfer v. Buckley*, 598 U.S. 69, 83 (2023) ("innocent people are sometimes held liable for fraud they did not personally commit, and, if they declare bankruptcy, § 523(a)(2)(A) bars discharge of that debt."); *accord Illinois Dept. Emp. Sec. v. Davis* (*In re Davis*), 668 B.R. 580, 600 (Bankr. N.D. Ill. 2025) (Barnes, J.). Put another way, *Bartenwerfer* eliminates the "innocent debtor" defense to section 523 actions. *Postovit v. Bolling* (*In re Bolling*), 600 B.R. 838, 848 (Bankr. D. Colo. 2019) (explaining pre-*Bartenwerfer* defense and citing cases on same).

*Bartenwerfer* does not mean, as the Plaintiff first believed (a belief that Count II appeared to be based in), that a nondebtor may be held liable for the fraud of a debtor simply because the nondebtor may be co-liable for the resulting debt. That remains a question of state law, not bankruptcy law. Put another way, *Bartenwerfer* is about the operation of section 523, not about the law of fraud, and the bankruptcy court lacks the authority to make a dischargeability determination regarding a nondebtor. That is a question that must be answered in the nondebtor's bankruptcy case, should such a case be commenced. As a result, Count II as originally pled asks for an advisory opinion and the "bankruptcy court, like any other federal court, lacks the constitutional power to render advisory opinions …." *In re FedPak Sys., Inc.*, 80 F.3d 207, 211–12 (7th Cir. 1996).

The repleading of Count II did not save it. As repled, Count II sought a judgment against Spretnjak for false pretenses. Such a claim is not, however, a viable civil cause of action under Illinois law. As the court stated in the PSJ Order:

> [F]alse pretenses appear in Illinois statutes as theft or deceptive practices. *See* 720 ILCS 5-16 and 17-1. The Defendants claim that false pretenses are criminal in nature only and violations of the Illinois Criminal Code do not give rise to private cause of action. *Id.*; *see O'Malley v. Adams*, 2023 IL App (5th) 210381, ¶ 37 (Sept. 11, 2023). There is no private cause of action for violation of Criminal Code. *Pacha v. CoPart Inc.*, 2024 IL App (4th) 240625-U (Nov. 26, 2024), ¶33, *appeal denied*, Case No. 131372, 2025 WL 952353 (Ill. Mar. 26, 2025).

PSJ Order, p. 5. As the court then discussed, even if Count II as repled were interpreted to include a viable cause of action, such relief would not exist independently of the other counts involving Spretnjak. *Id.* at 6. Though the Defendants should have sought dismissal under Rule 12(b)(6) instead of summary judgment, the court concluded that as the Count was not viable, summary judgment was the appropriate remedy. *See, e.g.*, *Brent-Bell v. City of Chicago*, Case No. 17 C 1099, 2024 WL 4213213, at *11 (N.D. Ill. Sept. 17, 2024) (holding it appropriate to grant summary judgment to defendants on a count which is not a viable, stand-alone claim). As such, summary judgment was granted in favor of Spretnjak on Count II. PSJ Order, p. 6. As Spretnjak was the only Defendant named in Count II and no subsequent repleading permissibly revived that Count, Count II is no longer before the court. Because, however, that grant of summary judgment was in third-party dispute, the court by way of this Memorandum Decision asks that the District Court treat the PSJ Order as proposed findings and conclusions and exercise its supplemental jurisdiction to confirm the court's ruling therein.

As to Count III, the court concluded that the applicable statute of limitations, 735 ILCS 5/13-206, had run on December 31, 2016, and that Illinois law did not permit the statute to be revived as to Spretnjak as a result of actions by the Debtor. PSJ Order, at p. 8 (citing to *Joseph v. Carter*, 382 Ill. 461, 466 (1943); *Boynton v. Spafford*, 162 Ill. 113, 115 (1896)). As with Count II, the court therefore granted summary judgment in favor of Spretnjak. *Id.* (citing to *Brent-Bell*, 2024 WL 4213213, at *11). As Spretnjak was the only Defendant named in Count III and no subsequent repleading permissibly revived that Count, Count III is no longer before the court. Because, however, that grant of summary judgment was in third-party dispute, the court by way of this Memorandum Decision asks that the District Court treat the PSJ Order as proposed findings and conclusions and exercise its supplemental jurisdiction to confirm the court's ruling therein.

Similarly, as to Count IV, the court also concluded that the applicable statute of limitations, 735 ILCS 5/13-205; *Bear Valley Partners v. McDonald's Corp.*, 2024 IL App (2d) 230245-U, ¶ 73 ("In Illinois, it is well established that fraud claims are subject to the five-year statute of limitations set forth in section 13-205 of the Code of Civil Procedure."), *appeal denied*, 244 N.E.3d 237 (Ill. 2024), had run on December 31, 2011 (five years after the Debtor failed to pay the Note). PSJ Order, at p. 8; *Brent-Bell*, 2024 WL 4213213, at *11. As Spretnjak was the only Defendant named in Count IV and no subsequent repleading permissibly revived that Count, Count IV is no longer before the court. Because, however, that grant of summary judgment was in third-party dispute, the court by way of this Memorandum Decision asks that the District Court treat the PSJ Order as proposed findings and conclusions and exercise its supplemental jurisdiction to confirm the court's ruling therein.

Count V seeks imposition of a constructive trust on both the assets of the Debtor and the assets of nondebtor Spretnjak. While the United States Code coveys upon this court, through reference from the District Court, exclusive jurisdiction over both the assets of the estate and the assets of the Debtor, 28 U.S.C. § 1334(e), it conveys no jurisdiction to this court over a nondebtor's assets. True, in limited circumstances, other assets might be subject to the court's authority, *see, e.g.*, 11 U.S.C. § 550(a) (granting the court authority to order recovery of property transferred to third parties), that could be viewed as an extension of what is, in fact, an asset of an estate or a debtor and, regardless, this is not one of those circumstances. In the PSJ Order, the court considered Count V and concluded that, under Illinois law, "a constructive trust is a remedy, not a cause of action." PSJ Order, p. 8 (*quoting Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1045 (Ill. App. 1st Dist. 2015)). As a remedy, the court concluded that Count V was not independently justiciable but rather would be considered in light of the Plaintiff's success on the other counts as remedy therefor. PSJ Order, p. 9. As a remedy, the court's jurisdiction rests in its authority to determine the actual, justiciable harm. Here, as the court concludes that the only justiciable harm is that as against the Debtor on Count VII, the court may only assess such remedy as against the Debtor. It has jurisdictional, statutory and constitutional authority to do so. 28 U.S.C. § 157(b)(2)(A) & (B); *Stern*, 564 U.S. at 499; *In re Montalbano*, 486 B.R. 436, 438–39 (Bankr. N.D. Ill. 2013) (Barnes, J.) (citing *Lenior v. GE Capital Corp.* (*In re Lenior*), 231 B.R. 662, 667 (Bankr. N.D. Ill. 1999) (Schmetterer, J.); *Knox v. Sunstar Acceptance Corp.* (*In re Knox*), 237 B.R. 687, 693 (Bankr. N.D. Ill. 1999) (Schmetterer, J.)). Count V simply does not apply to Spretnjak as there exists no justiciable count as to Spretnjak. The court need not, therefore, invoke the District Court's jurisdiction as to Count V in relation to Spretnjak.

Count VI seeks judgment against both the Debtor and Spretnjak for common law spoliation. As with Count V and as noted in the PSJ Order, under applicable Illinois law, spoliation is not an independent cause of action but rather sounds in negligence. PSJ Order, p. 9 (*citing to Boyd v. Travelers Ins. Co.*, 166 Ill. 2d 188, 195 (1995), *as modified on denial of reh'g* (June 22, 1995)). In the PSJ Order, however, the court therefore found that the Complaint did sound in negligence and thus declined to render summary judgment on Count VI. PSJ Order, p. 9. The only count that could have been so interpreted are Counts I, II and IV. As to Spretnjak and Counts II and IV, the court has found each count to be time-barred. As a result, Count VI simply does not apply to Spretnjak as there exists no justiciable count as to Spretnjak.

The court need not, therefore, invoke the District Court's jurisdiction as to Count VI in relation to Spretnjak. As to the Debtor, as the court has jurisdictional, statutory and constitutional

authority to render judgment on Count I, it similarly has jurisdictional, statutory and constitutional authority to render judgment in Count VI.

Finally, Count VII seeks judgment against the Debtor alone for breach of contract. As discussed above, had the court concluded that the debt owed to the Plaintiff was nondischargeable, the entry of a monetary judgment in relation thereto would be problematic. However, with respect to a dischargeable claim, the court's jurisdiction sounds in claims resolution. The court has jurisdiction to enter judgment as to the Debtor and the estate as a core proceeding. 28 U.S.C. § 157(b)(2)(B). *In re Rosebud Farm, Inc.*, 660 B.R. 222, 237 (Bankr. N.D. Ill. 2024) (Barnes, J.), *aff'd sub nom. Longo & Assocs., Ltd. v. Moglia as trustee for Rosebud Farm, Inc.*, Case No. 18 B 24763, 2025 WL 849615 (N.D. Ill. Mar. 18, 2025).

## SUMMARY OF DISPOSITION

For many of the reasons discussed both above and below, judgment will be rendered as follows:

| | |
|---|---|
| Count I: | Judgment in favor of the Debtor. The Plaintiff has failed to elevate his Complaint beyond that of a simple contract dispute and establish that the claim arose out of fraud. |
| Count II: | Judgment in favor of Spretnjak. Count II seeks an advisory opinion regarding a nondebtor. PSJ Order. |
| Count III: | Judgment in favor of Spretnjak. Count III is time-barred. PSJ Order. |
| Count IV: | Judgment in favor of Spretnjak. Count IV is time-barred. PSJ Order. |
| Count V: | Judgment in favor of the Debtor. The Plaintiff has failed to establish the elements of constructive trust. Count V is nonjusticiable as to Spretnjak. |
| Count VI: | Judgment in favor of the Debtor. The Plaintiff has failed to establish the elements of negligence or fraud in relation to his claim. Count VI is has been abandoned as to Spretnjak. |
| Count VII: | Judgment in favor of the Plaintiff against the Debtor in the principal amount of the unpaid debt on the Petition Date. Interest, costs and attorneys' fees to be determined. |

## BACKGROUND[3]

The matter before the court is, in its most simple form, a claim against the Debtor and nondebtor Spretnjak for an unpaid prepetition loan. To understand better the less-than-simple form of this dispute, it is necessary to consider the parties' relationship and what transpired regarding that loan prior to the commencement of the Chapter 7 Case.

---

[3] The facts in this Background are almost entirely undisputed. They are set forth in detail in the Findings of Fact, below.

The Plaintiff is the first cousin of the Debtor. They have known each other since childhood. The Debtor and Spretnjak have been married to each other since the 1990s.

Prior to the commencement of the Chapter 7 Case, the Debtor was a real estate investor and property manager who, together with his siblings, owned four commercial properties in Chicago (the "Properties"), all of which were purchased prior to the marriage of the Defendants. The Properties include the property located at including 8000 S. Ellis, Chicago, Illinois 60619 (the "Ellis Property"). Also, prior to his marriage to Spretnjak, the Debtor purchased a condominium for his residence, located at Unit 3, 6740 S. Oglesby, Chicago Illinois 60649 (the "Home").

In 2006, the Debtor asked the Plaintiff for a loan in the amount of $150,000.00 (the "Loan"). On March 31, 2006, the Debtor and Spretnjak signed the Note, dated April 1, 2006, in the amount of $150,000.00 and due December 31, 2006. By the Note's terms, the Defendants are jointly and severally liable as borrowers. The Note granted the Plaintiff a security interest in the Home, which the Plaintiff appears to have perfected by recording on March 31, 2006. Mortgage, Dx. 2. The initial interest rate on the Note was the extraordinary rate of 47.2%, but upon default, the interest rate increased by an additional 5% to the even more extraordinary rate of 52.2%. Per the terms of the Note, the Loan matured and was due to be paid in full on December 31, 2006.

The purpose of the Loan is unclear. According to the Note, the proceeds of the Loan were to be used to make improvements to the Ellis Property, though no more specific use was indicated therein. Regardless, the Plaintiff now asserts that the Loan proceeds were to be used specifically to upgrade the heating system at the Ellis Property. In addition to a usurious interest rate, the Note took only a security interest in the Home, not any of the Properties. Other than the limitation noted above, the Note has no commercial covenants or terms that would allow the Plaintiff to control the use of the proceeds thereunder. Further, it is clear that the Plaintiff did little or no diligence prior to making the Loan. Were it a business loan, it is an ill-conceived one.

The Debtor's business did not go well, and in addition to not paying the Loan, the Debtor lost his interest in all of the Properties prior to the commencement of the Chapter 7 Case. Further, the Home was also lost to foreclosure. While the details of that foreclosure have not been fully provided to the court, the Plaintiff argues that he received no notice of the foreclosure despite his recorded interest in the Home. The Plaintiff blames the Debtor for that lack of notice.

On April 30, 2016, nearly ten years after the Note matured, the Plaintiff received a payment of $1,000.00 from Dexter Construction Services LLC, an entity owned by the Debtor. Otherwise, the Plaintiff has not received a payment since the Note matured. As a result of the foregoing, the Loan remained mostly unpaid at the outset of the Chapter 7 Case.

## PROCEDURAL HISTORY

### A. The Chapter 7 Bankruptcy Case

On May 16, 2014 (the "Petition Date"), the Debtor commenced the Chapter 7 Case by filing his Chapter 7 Voluntary Petition [Dkt. No. 1] (the "Petition"). The Plaintiff was not listed as a creditor in the schedules attached to the Petition (the "Schedules") in the Chapter 7 Case and, as a result, received no notice of the commencement of Chapter 7 Case. *See* Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines [Dkt. No. 9].

The Chapter 7 Case is what is referred to as a "no asset" chapter 7, the chapter 7 trustee having found no assets to distribute. Chapter 7 Trustee's Report of No Distribution [Dkt. No. 17]. As a result, on December 18, 2014, the Debtor was granted a discharge, Discharge Order [Dkt. No. 29] (the "Discharge"), and on December 22, 2014, the Chapter 7 Case was closed. Bankruptcy Case Closed and Trustee Discharged [Dkt. No. 31].

B. Subsequent Events

On November 12, 2019, the Plaintiff commenced an action in the Illinois Law Division of Cook County, Case No. 2019L012462 (the "State Court Proceeding"). In the State Court Proceeding, the Plaintiff pled breach of contract, common law fraud and constructive trust with respect to the Defendants' failure to make payments pursuant to the Note. Motion Pursuant to 11 U.S.C. § 523(a)(3)(B) to Modify Stay as to Omitted Fraudulently-Induced Debt, Exh. D [Dkt. No. 35] (the "State Court Complaint").

On August 3, 2020, the Defendant filed a motion to reopen the Chapter 7 Case. Motion to Reopen Chapter 7 Bankruptcy Case [Dkt. No. 33] (the "Motion to Reopen"). The Motion to Reopen, brought pursuant to section 350(b) of the Bankruptcy Code, sought leave to reopen the Chapter 7 Case in order to amend the Schedules to add the debt owed to the Plaintiff.

Upon receipt of the Motion to Reopen, the Plaintiff filed a motion to modify the Debtor's Discharge. Motion Pursuant to 11 U.S.C. § 523(a)(3)(B) to Modify Stay as to Omitted Fraudulently-Induced Debt [Dkt. No. 36] (the "Motion to Modify"). The Motion to Modify sought a modification of the discharge injunction, arguing that, as the Plaintiff first learned of the Chapter 7 Case in 2019, the Discharge was improper. On August 10, 2020, the court denied the Motion to Modify, Order Denying for the Reasons Stated on the Record Motion to Modify Discharge Injunction [Dkt. No. 39], informing the Plaintiff that the question was not the Discharge, but rather, the nature of the Plaintiff's claim.[4] As a complaint other than under section 523(c) of the Bankruptcy Code may be filed at any time, the entry of the Discharge did not foreclose the Plaintiff's rights and thus need not be altered. Instead, the court informed the Plaintiff that he was free to commence an adversary proceeding seeking a determination under section 523 and that such an adversary proceeding could be brought in the reopened Chapter 7 Case. As a result, the court granted the Motion to Reopen. Order Granting Motion To Reopen Chapter 7 Case [Dkt. No. 40].

---

[4] It should be noted that, though the Chapter 7 Case was reopened by the Plaintiff, the Plaintiff has not filed a claim within it. Nor should he have to. As the Chapter 7 Case is, as noted above, a "no asset" case, creditors did not have to file claims. Fed. R. Bankr. P. 2002(e); *Stolfo v. Kindercare Learning Ctrs, LLC* (*In re Stolfo*), 727 F. Appx. 861, 865 (7th Cir. 2018). By the same token, that means there are and were no assets in the bankruptcy estate available for distribution to creditors. "In a case without assets to distribute the right to file a proof of claim is meaningless and worthless." *In re Mendiola*, 99 B.R. 864, 867 (Bankr. N.D. Ill. 1989) (Barliant, J.). Nonetheless, though meaningless, the Seventh Circuit has made clear that such a right for a creditor who has had no notice of a chapter 7 case must be preserved. *Stark v. St. Mary's Hospital (In re Stark)*, 717 F.2d 322, 324 (7th Cir. 1983) (*per curiam*). Thus, though the result of this Memorandum Decision is that any claim by the Plaintiff will be discharged, the Plaintiff is free to file such a claim while the Chapter 7 Case is open.

C. The Initial Complaints

On September 8, 2020, the Plaintiff commenced the Adversary. Complaint [Adv. Dkt. No. 1] (the "Original Complaint").

On September 23, 2020, the Defendants sought dismissal of the Original Complaint. Debtor-Defendant's Motion to Dismiss Adversary Complaint [Adv. Dkt. No. 7] (the "First Motion to Dismiss"). The First Motion to Dismiss was resolved by agreement. Agreed Order Resolving Motion to Dismiss [Adv. Dkt. No. 21]. Pursuant to that agreement, the Plaintiff was granted leave to file an amended complaint.

On December 4, 2020, the Plaintiff filed that amended complaint. Amended Adversary Complaint [Adv. Dkt. No. 23] (the "First Amended Complaint"). The First Amended Complaint sought, via a single count, a judgment that the debt owed to the Plaintiff by the Debtor was obtained by false pretenses and thus, exempt from discharge pursuant to section 523(a)(2)(A) of the Bankruptcy Code.

On December 31, 2020, the Debtor answered the First Amended Complaint. Answer to Amended Adversary Complaint [Adv. Dkt. No. 27].

On that same date, however, the Debtor sought to strike paragraphs 26 and 27 of the First Amended Complaint on the theory that they were immaterial, impertinent and inflammatory. Motion To Strike Pursuant to Federal Rules of Civil Procedure 12(F) [Adv. Dkt. No. 25] (the "Motion to Strike"). The Debtor argued that, that the Plaintiff's allegation in paragraph 26, that the Debtor borrowed money from his brother Dan and did not pay it back, is immaterial and should be stricken. The Debtor argues that the allegation has no bearing on the debt as alleged in the First Amended Complaint, noting that there is no allegation that the Plaintiff specifically asked about other outstanding loans which the Debtor lied about, nor that such information was omitted in a loan application. In paragraph 27, the Plaintiff alleged that the Debtor was perpetrating a scam wherein he used the Ellis Property as bait to attract lenders in order to pocket the money for the Defendants' own personal use, which the Debtor argued should be stricken as it was included in the First Amended Complaint in an attempt to bias the court against the Debtor.

After briefing, the court denied the Motion to Strike, finding that the allegations therein failed to meet the Debtor's burden, pursuant to Fed. R. Civ. P. 12(f), to demonstrate that the matters in question were redundant, immaterial, impertinent or scandalous. Order Denying Motion to Strike [Adv. Dkt. No. 39]. The court ordered the Debtor to file an answer responsive to paragraphs 26 and 27 of the First Amended Complaint on or before February 16, 2021. Orders [dated February 8, 2021] [Adv. Dkt. Nos. 39 & 40]. On February 16, 2021, the Debtor filed the Amended Answer to Amended Adversary Complaint [Adv. Dkt. No. 44], substantively denying the allegations contained in paragraphs 26 and 27 of the First Amended Complaint.

On March 28, 2022, the State Court Proceeding was removed to the United States District Court for the Northern District of Illinois and referred to the undersigned. Order of Referral from the U.S. District Court (the "Order of Referral"). The Order of Referral thereby commenced the Removed Case. After a status hearing and upon the oral motion of the parties, on April 12, 2022, the court, pursuant to Fed. R. Civ. P. 42(a)(2) (made applicable through Fed. R. Bankr. P. 7042),

consolidated the Removed Case into the Adversary. Order Consolidating Adversary Proceedings [Adv. Dkt. No. 58; Removed Case, Dkt. No. 7].

Following a status conference on February 22, 2023, the court gave the Plaintiff leave to file another, further amended complaint. Scheduling Order [Adv. Dkt. No. 73]. On February 24, 2023, the Plaintiff filed the Second Amended Adversary Complaint [Adv. Dkt. No. 74] (the "Second Amended Complaint"). The Second Amended Complaint added Spretnjak as one of the Defendants. *Id.*

On March 24, 2023, the Debtor answered part of the Second Amended Complaint, Debtor-Defendant's Chrisopher E. Fletcher's Answer to Count I of the Second Amended Adversary Complaint [Adv. Dkt. No. 74], but thereafter the Defendants collectively moved to dismiss the remainder of the Second Amended Complaint—several times. Motion to Dismiss Second Amended Adversary Complaint [Adv. Dkt. No. 75] (the "Second Motion to Dismiss"); Motion to Dismiss Second Amended Adversary Complaint [Adv. Dkt. No. 78] (the "Third Motion to Dismiss"). After a hearing, the court mooted the Second Motion to Dismiss as being superseded by the Third Motion to Dismiss, but at the same time denied the Third Motion to Dismiss for failure to comply with the Local Rules. Orders [dated April 5, 2023] [Adv. Dkt. Nos. 82 & 84].

On that same day, the Defendants again moved to dismiss the Adversary. Motion to Dismiss Second Amended Adversary Complaint [Adv. Dkt. No. 83] (the "Fourth Motion to Dismiss"). After briefing and a hearing thereon, the court granted the Defendants' request to dismiss Counts II and V of the Second Amended Complaint but denied the Defendants' request to dismiss Counts III, IV and VI of the Second Amended Complaint. Order Granting in Part Motion to Dismiss [Adv. Dkt. No. 94]. Count II was dismissed without prejudice and the court granted the Plaintiff leave to replead it. *Id.* Count V was also dismissed without prejudice, but subject to the condition that the Plaintiff would be required to seek leave from the court with justification in order to replead Count V. *Id.*

On June 21, 2023, the Plaintiff filed a newly amended complaint, repleading with leave Count II and without leave Count V. Third Amended Adversary Complaint [Adv. Dkt. No. 96] (the "Third Amended Complaint"). The Plaintiff thereafter sought forgiveness for the unauthorized repleading of Count V. Motion for Leave to File Count V of Plaintiff's Third Amended Adversary Complaint [Adv. Dkt. No. 97] (the "Motion for Leave").

On July 12, 2023, other than as to Count II, the Defendants answered all previously unanswered Counts of the Third Amended Complaint and asserted for the first time affirmative defenses regarding some of the same. Answer to Counts I, III, IV and VI of the Third Amended Adversary Complaint and Affirmative Defenses [Adv. Dkt. No. 98]. As to Count II, the Defendants simultaneously sought its dismissal. Defendants' Motion to Dismiss Count II of the Third Amended Adversary Complaint [Adv. Dkt. No. 100] (the "Fifth Motion to Dismiss").

On July 19, 2023, after a hearing on both motions, the court denied the Fifth Motion to Dismiss without prejudice for the reasons stated on the record, Order Denying for the Reasons Stated on the Record without Prejudice Motion to Dismiss Count(s) II of Adversary Proceeding [Adv. Dkt. No. 102] and granted the Motion for Leave [Adv. Dkt. No. 103].

Thereafter, the Plaintiff again amended his complaint. Plaintiff's Amended Third Amended Adversary Complaint [Adv. Dkt. No. 104] (the "Amended Third Amended Complaint"). In the Amended Third Amended Complaint, the Plaintiff repled with leave Count V. Thereafter, on July 28, 2023, the Defendants answered the Amended Third Amended Complaint. Defendants' Answer to the Amended Third Amended Adversary Complaint and Affirmative Defenses [Adv. Dkt. No. 105].

On August 2, 2023, following a status hearing, the parties were ordered to conduct a Rule 26(f) planning conference and submit a joint written discovery plan regarding the Amended Third Amended Complaint prior to the next scheduled status hearing. Order Setting Scheduling Conference [Adv. Dkt. No. 108]. Thereafter, the Parties' Rule 26(f) Planning Conference Report [Adv. Dkt. No. 109] was filed and following further status hearing on August 30, 2023, the court ordered discovery deadlines. [Order Scheduling] Parties' Rule 26(f) Planning Conference Report [Adv. Dkt. No. 111]. Status was continued for further hearing to April 17, 2024. Hearing Continued [Adv. Dkt. No. 110]. Following the April 17, 2024, status hearing, the matter was continued for further status to July 10, 2024, at which hearing the court entered an order extending the deadline for completion of discovery and continuing the matter for further status to September 4, 2024. Scheduling Order [Adv. Dkt. No. 113]. Subsequently, further status on the matter was continued to November 6, 2024, and the discovery deadline was extended to November 6, 2026, by agreement. Hearing Continued [Adv. Dkt. No. 116], Agreed Order [Adv. Dkt. No. 117]. On November 6, 2024, further status on the matter was continued to January 15, 2025. [Adv. Dkt. No. 118].

On January 15, 2025, the Defendants sought partial summary judgment on the Amended Third Amended Complaint. Christopher Fletcher and Laura Spretnjak's Motion for Partial Summary Judgment [Adv. Dkt. No. 120] (the "Original MSJ"). On February 5, 2025, the Defendants amended the Original MSJ. [Amended] Christopher Fletcher and Laura Spretnjak's Motion for Partial Summary Judgment [Adv. Dkt. No. 128] (the "Amended MSJ"); *see also* Christopher Fletcher and Laura Spretnjak's Statement of Material Facts in Support of Motion for Partial Summary Judgment [Adv. Dkt. No. 129].

On February 19, 2025, after a hearing on the matter, the court mooted the Original MSJ, Order Mooting Motion for Summary Judgment [Adv. Dkt. No. 131] and ordered briefing on the Amended MSJ. [Scheduling] Order [Adv. Dkt. No. 133]. On May 13, 2025, after consideration of the briefing and a hearing thereon, the court granted the Amended MSJ as to Counts II, III and IV, denied it as to Count VI and declined to render judgment at that time as to Count V, concluding that Count V exists only as a collection remedy and not as an independent count. Order Granting in Part and Denying in Part Motion for Summary Judgment [Adv. Dkt. No. 148] (the "Partial Summary Judgment Order").

With respect to Count II, the court found that it was not a viable, free-standing count, as it contained nothing to support an independent cause of action against Spretnjak that would not already be encompassed by the Plaintiff's other Counts involving her. *Id.* at 6.

With respect to Count III, the court found that the ten-year statute of limitations applicable under section 13-206, 735 ILCS 5/13-206, ran on December 31, 2016. *Id.*

With respect to Count IV, the court found that the 5-year statute of limitations, applicable under 735 ILCS 5/13-205, ran five years after "the Plaintiff became aware, or with reasonable diligence, should have become aware of its injury." *Id.* at 8 (citation omitted). The court found that the Defendant "was on notice of an issue with the Note when the Defendants failed to pay it on the maturity date, December 31, 2006." *Id.* Therefore, the statute of limitations ran on or before December 31, 2011.

With respect to Count V, the court found that Count V was pled solely as a collection remedy that would "only be valid if the Plaintiff is successful in obtaining a monetary judgment against one or both of the Defendants," and as such, declined to rule on it in the Partial Summary Judgment Order, holding that the "issue will not proceed unless the Plaintiff is successful on Count VI" because Count VI is the only remaining count on which the Plaintiff seeks monetary recovery. *Id.* at 9.

Finally, with respect to Count VI, the court found that the statute of limitations would not have run until five years after the Plaintiff first became aware of the potential spoliation claim and that there are sufficient facts in dispute so as to merit a trial on the issue of when the Plaintiff first became so aware. The court further found that the Complaint "sounds in negligence" and Count VI is "sufficiently pled so as to include the elements of negligence." *Id.* at 10.

As a result, the court rendered summary judgment in favor of Spretnjak on Counts II, III and IV, noting that Counts I and VI remained justiciable for trial. *Id.*

D. <u>The Fourth Amended Complaint</u>

As discussed below, though the parties' pretrial filings related to the Amended Third Amended Complaint, with leave, on May 21, 2025, the Plaintiff again amended his complaint, filing what is the Complaint under review by the court today. Fourth Amended Adversary Complaint.

Despite the court having rendered summary judgment in favor of Spretnjak with respect to Counts II, III and IV, all three of which were plead *only* against Spretnjak, in the Complaint the Plaintiff plead Counts I–VI identically to how they were plead in the Amended Third Amended Complaint. *Id.* The only change made to the Complaint was the addition of Count VII. *Id.* at 17–18, ¶¶ 103–116. In Count VII, the Plaintiff plead a breach of contract claim against the Debtor only, alleging that the Debtor defaulted on the Note, made false statements with the intention of delaying the Plaintiff from filing this lawsuit and that the Debtor's last payment to the Plaintiff was $1,000.00 received on April 30, 2016. *Id.*

1. *The Complaint*

Given the Plaintiff's apparent disregard for the court's Partial Summary Judgment Order, evidenced by the Complaint re-pleading Counts II, III and IV verbatim to those plead in the Amended Third Amended Complaint and after the court published the Partial Summary Judgment

Order, it is necessary to reconsider the status of all seven counts as of the outset of the Trial (as defined below):[5]

| | |
|---|---|
| Count I: | Count I remains justiciable against the Debtor alone; |
| Count II: | Count II is no longer justiciable as summary judgment was granted in favor of Spretnjak, the only Defendant named in the Count; |
| Count III: | Count III is no longer justiciable as summary judgment was granted in favor of Spretnjak, the only Defendant named in the Count; |
| Count IV: | Count IV is no longer justiciable as summary judgment was granted in favor of Spretnjak, the only Defendant named in the Count. |
| Count V: | Count V remains justiciable as a collection remedy against either Defendant for Count VI. Count V may also be justiciable as a collection remedy against the Debtor for Count VII. |
| Count VI: | Count VI remains justiciable against either Defendant. |
| Count VII: | Count VII remains justiciable against the Debtor, the only Defendant named therein. |

As to the justiciable Counts, in Count I, the Plaintiff makes a series of allegations that, by his estimation, lead to a finding of nondischargeability. Among those allegations, the Plaintiff alleges that he was induced to incur the debt by the Defendants' false promise to use the Loan proceeds exclusively for the purpose of making improvements to the Ellis Property. Specifically, the Plaintiff alleges that the Debtor promised to use the Loan proceeds to convert the heating system at the Ellis Property from central radiator natural gas heating (which was paid for by the Debtor and his brothers) to separate electric heating units in each apartment (which would be paid for by the tenants). The Plaintiff further alleges that the Defendants failed to disclose that the Debtor was stealing natural gas to heat the Ellis Property, a fact that, if true, the Plaintiff alleges knowledge of which would have resulted in his unwillingness to make the Loan. Last, the Complaint seeks to establish that, in order to induce the Plaintiff to make the Loan, the Debtor made false representations that the Ellis Property was larger and contained more rental units than it actually did.

In support of Count I, the Plaintiff further alleges that the Defendants never intended to repay the debt and never intended to use the proceeds for the purpose of making improvements to the Ellis Property. Instead, the Plaintiff alleges that the Defendants intended to use the Loan proceeds for their personal use. The Plaintiff alleges that rather than making improvements to the Ellis Property, the Defendants intended to and did use the Loan proceeds to repay a mortgage against the Ellis Property and that the Plaintiff would not have made the Loan if he had known that the Defendants intended to use its proceeds to pay off another creditor. The Plaintiff further alleges

[5] Status of the Counts as of the advent of the Trial is derived from the court's holdings in the Partial Summary Judgment Order [Adv. Dkt. No. 148] and the Counts as plead in the Complaint.

that the Defendants had also borrowed $40,000.00 from one of the Debtor's brothers and that, had the Plaintiff been aware of that, that he would not have made the Loan.

In Count V, the Plaintiff pleads a constructive trust claim against both of the Defendants, alleging generally that the Defendants have engaged in wrongful and unlawful conduct that amounts to fraud of creditors by the transfer of assets, and argues that, therefore, upon a finding of false pretenses, the Plaintiff is entitled to the imposition of a constructive trust with respect to a number of properties once owned by the Defendants. Count V is only viable if the Plaintiff is able to successfully obtain a money judgment against either or both of the Defendants. Thus, Count V is operative at Trial only to the extent that the Plaintiff is successful on Counts VI and/or VII at Trial.

In Count VI, the Plaintiff pleads a common law spoliation claim against both of the Defendants, alleging that, as a result of the negligent acts or omissions, or intentional acts or omissions, of the Defendants, the Plaintiff's ability to prosecute and enforce his legal rights against the Defendants has been injured and thus Plaintiff has been irrevocably and severely prejudiced in his ability to prove the underlying suit against the Defendants by the destruction and or modification of material evidence. The Plaintiff alleges that the Defendants had a duty to preserve ordinary course business records under the Note and that, because of the covenant in the Note that the proceeds of the Loan were to be used for making improvements to the Ellis Property, the Defendants were on notice that such "special circumstances" extended the duty to the Ellis Property and records relating thereto. The Plaintiff argues that, because the Debtor failed to give the Plaintiff notice of his bankruptcy filing, the Debtor's concealment, destruction or failure to keep business records related to the Ellis Property after the bankruptcy violated his duties irrespective of the conclusion of the bankruptcy proper. Further, the Plaintiff argues that that duty extended to Defendant Spretnjak as a principal, officer or partner of the Ellis Property because she is jointly liable on the Note.

In Count VII, pled for the first time in the Complaint, the Plaintiff seeks breach of contract damages against the Debtor under Illinois law. The Plaintiff alleges that the Debtor defaulted on the Note by failing to make payments timely and failing to use the proceeds of the Loan solely for the purpose of making improvements to the Ellis Property. In this count, the Plaintiff also alleges that the Debtor made partial payments and false statements to the Plaintiff regarding possible business deals on the horizon for the Debtor, expressly for the purposes of misleading the Plaintiff into believing the Debtor intended to repay him and for the express purpose of causing the Plaintiff to delay the commencement of collection actions against the Defendants.

Thus, the operative, justiciable Counts of the Complaint are Count I (solely against the Debtor); Count V (against both Defendants), Count VI (against both Defendants) and Count VII (solely against the Debtor) (together, the "Operative Counts").

2. *The Defendants' Answer to the Fourth Amended Adversary Complaint and Affirmative Defenses to the Complaint*

On June 2, 2025, the Defendants filed an answer to the Complaint. Defendants' Answer to the Fourth Amended Adversary Complaint and Affirmative Defenses [Adv. Dkt. No. 156] (the "Answer"). As Counts II, III and IV were adjudicated by the Partial Summary Judgment Order and did not require an answer, the court does not consider anything with respect to those Counts in the Answer. In the portions of the Answer responsive to the Operative Counts, the Defendants denied

the Plaintiff's substantive allegations with respect to Counts I, V and VI. The Defendants did not respond to any of the allegations in Count VII but noted that a motion to dismiss would be filed.

3. *The Sixth Motion to Dismiss*

The Defendants thereafter requested leave to file another motion to dismiss. On May 28, 2025, the court gave leave to the Defendants to file one last motion to dismiss relating to Count VII and set a prospective briefing schedule relating thereto. [Scheduling] Order [Adv. Dkt. No. 155] (the "Scheduling Order"). In accordance with that order, on June 2, 2025, the Defendants moved to dismiss Count VII of the Complaint. Christopher Fletcher's Motion to Dismiss Count VII under F.R.C.P. 12(b)(6) [Adv. Dkt. No. 161] (the "Sixth Motion to Dismiss").

The Plaintiff failed to comply with the Scheduling Order and did not file a timely response. Though the Scheduling Order permitted no reply if no response was filed, the Defendants nonetheless filed an unhelpful reply stating that they were not filing a reply. Christopher Fletcher's Reply in Support of Motion to Dismiss Count VII Under F.R.C.P. 12(b)(6) [Adv. Dkt. No. 164]. This prompted a late motion from the Plaintiff seeking to rectify his omission. Plaintiff's Motion for Leave to File His Response to Defendant's FRCP 12(b)(6) Motion Instanter [Adv. Dkt. No. 165] (the "Motion for Leave").

At a status hearing on July 1, 2025, the court denied both the Motion for Leave and the Sixth Motion to Dismiss, entering an order explaining its reasoning on the latter. Order Denying Motion to Dismiss Count VII [Adv. Dkt. No. 167] (the "Denial Order"). In entering the Denial Order, the court found that the Sixth Motion to Dismiss was based on the statute of limitations and that such limitations were more appropriately addressed under the standards of summary judgment. In considering the Sixth Motion to Dismiss under the standards of summary judgment, the court found that there were material facts in dispute as to whether a payment by Dexter Construction Services LLC satisfied the factual predicates required to revive the statute of limitations as to the Debtor but found, pursuant to Fed. R. Bankr. P. 56(g), that two material facts were not genuinely in dispute and are established in this case for the purposes of the Trial: (a) that Defendant Fletcher is the owner of Dexter Construction Services LLC; and (b) the Plaintiff received a check from Dexter Construction Services LLC dated April 30, 2016, in the amount of $1,000.00. *Id.*

In the Denial Order, the court ordered that the Trial would take place as scheduled and no further delays would be permitted. *Id.*

4. *The Answer to Count VII*

Though the Sixth Motion to Dismiss was denied, the Defendants failed to answer timely Count VII of the Complaint. It was not until August 28, 2025, the third day of the Trial, that the Defendants did so. Defendants' Answer to Count VII of the Fourth Amended Adversary Complaint [Adv. Dkt. No. 180] (the "Count VII Answer").

Although the timing is entirely irregular, as the Plaintiff has not challenged the timeliness of the Count VII Answer, the court considers it here.

In the Count VII Answer, in response to the Plaintiff's allegation that the Defendants' promises were joint and several, the Defendants denied the allegation, stating that Spretnjak was dismissed from the matter because she is no longer named as a party to the spoliation claim under

Count VI of the Complaint. Count VII Answer, ¶ 104. The Defendants further noted that the breach of contract claim plead in Count VII is only directed at the Debtor. *Id.* The Debtor admitted to defaulting on the Note by failing to make timely payments and asserted that said breach of contract claim is barred by the ten-year statute of limitations because the breach occurred in December 2006 and the lawsuit was first filed in 2019. *Id.* at ¶ 106. The Debtor also admitted that partial payments were made to the Plaintiff between 2007 and 2009 for the purpose of repaying the Loan. *Id.* at ¶ 109. The Debtor also admitted that, on or about April 30, 2016, a $1,000.00 payment was made out to the Plaintiff by Dexter Construction, LLC but denied that it was for repayment of the Loan. *Id.* at ¶ 112. The Debtor denied the remaining allegations of Count VII.

THE PRETRIAL STATEMENTS, EVIDENTIARY RULINGS AND TRIAL

A. Pretrial Procedure

On May 14, 2025, prior to the filing of the Complaint, the court entered a trial scheduling order with respect to the Amended Third Amended Complaint. Trial Scheduling Order [Adv. Dkt. No. 152]) (the "Trial Scheduling Order"). The Trial Scheduling Order set processes and procedures for a trial to take place on August 26, 27, 28 and 29, 2025 (the "Trial").

In the Trial Scheduling Order, the court ordered, among other things, counsel for all parties to confer for the purpose of together preparing and filing with the court "a *joint document* captioned 'Pretrial Statement'" (emphasis in original) containing a brief statement of the theory of each claim and each defense, a statement of stipulated facts, a statement setting out the material facts which are in dispute, each party's list of witnesses with any objections noted and each party's list of the exhibits it plans to offer with objections noted and stating the grounds of any noted objections. The Trial Scheduling Order also ordered each party to separately file with the court an individual pretrial brief containing a description of what the party believes the evidence at trial will show, a statement of salient legal issues and a thorough and complete legal argument, with citations to relevant legal authorities, supporting the party's contentions on the merits. The Trial Scheduling Order set a deadline for filing with the court both the joint pretrial statement and individual pretrial briefs on or before August 12, 2025.

It will, perhaps, come as no surprise given the multiplicity of proceedings that led to this point, that the parties did not comply with the court's instructions for filing a joint pretrial statement. Instead, on August 12, 2025, the Defendants filed an inaptly named "joint" pretrial statement, though that statement was solely on behalf of the Defendants. Joint Pretrial Statement [Adv. Dkt. No. 171] (the "Defendants' Pretrial Statement"), addressing only Counts I, VI and VII thereby omitting Count V of the Operative Counts. Shortly thereafter, the Plaintiff compounded the filing error with his "joint" pretrial statement. Joint Pretrial Statement [Adv. Dkt. No. 173] (the "Plaintiff's Pretrial Statement" and together with the Defendants' Pretrial Statement, the "Pretrial Statements"). The Plaintiff's Pretrial Statement, too, omitted Count V.

In the Defendants' Pretrial Statement, the Defendants present their theory of the case in a somewhat confusing way. For example, a provision noted as addressing Count IV was in fact addressing Count VI.

As noted, the Defendants' Pretrial Statement is only on behalf of the Defendants, stating that "Defendants submit this Joint Pretrial Statement containing only Defendants' statements."

Defendants' Pretrial Statement, pp. 1–2. Though not in any way joint in nature, the Defendants' Pretrial Statement contains within it twenty-one paragraphs of "stipulated" facts. *Id.* at 2–3. It purports to list the Plaintiffs' witnesses (listing only John D'Aguanno) but does not similarly presume to list any of the Plaintiff's exhibits. *Id.* at 3–4.

The Plaintiff's Pretrial Statement, having been filed after the Defendants' Pretrial Statement, had the advantage of being able to incorporate the contents of the Defendants' Pretrial Statement. It contains the Defendants' statements of their defenses as articulated in the Defendants' Pretrial Statement. Plaintiff's Pretrial Statement, at pp. 1–3. It also contains a brief statement of theory of each of the Plaintiff's claims. *Id.* Though clearly not filed by agreement, it also contained six paragraphs of "stipulated" facts. *Id.* at 3. These six paragraphs of so-called "stipulated facts" are, at least, restatements of some of the stipulated facts contained in the Defendants' Joint Pretrial Statement. *Id.*

As the parties did not comply with the court's instructions for filing a jointly prepared pretrial statement, the court is left to make what limited sense it can of the foregoing. The stipulated facts (the "Stipulated Facts") are, therefore, solely limited to the six paragraphs of stipulated facts from the Defendants' Joint Pretrial Statement that are restated as stipulated facts in the Plaintiff's Pretrial Statement.

By the express terms of the Trial Scheduling Order, all exhibits to which no objections were raised in the pretrial statements would be admitted into evidence without the need to establish foundation and the failure to assert an objection would result in the waiver of any prehearing or evidentiary objections that could have been raised by such deadline. Trial Scheduling Order at ¶ 6. Despite the admission of exhibits by default, the Trial Scheduling Order also provided that if the parties failed to use any exhibit at the Trial, the court would not consider that exhibit to be relevant. *Id.*

In the Plaintiff's Pretrial Statement, the Plaintiff listed the nine exhibits he intended to use at Trial. Plaintiff's Pretrial Statement at p. 4. The Plaintiff did not object to any of the Defendant's exhibits but stated that "Plaintiff reserves the right to object in that some of those some of those [sic] documents were not produced in discovery." *Id.* at 5.

At the same time that the Pretrial Statements were filed, as required by the Trial Scheduling Order, Trial Scheduling Order at ¶ 3, each party also filed their respective pretrial brief. Defendants' Individual Pretrial Brief [Adv. Dkt. No. 170] (the "Defendants' Pretrial Brief"); Plaintiff's Pretrial Brief [Adv. Dkt. No. 172] (the "Plaintiff's Pretrial Brief" and together with the Defendants' Pretrial Brief, the "Pretrial Briefs").

B. Evidentiary Rulings

As the Plaintiff failed to comply with the Trial Scheduling Order regarding the discovery production issue, any such objections are overruled. The Trial Scheduling Order was clear as to what needed to be done and the Plaintiff's failure to comply with the court's orders must have some consequences. A party may not reserve a right that they do not have, *In re Cordova*, 668 B.R. 413, 433 (Bankr. N.D. Ill. 2025) (Barnes, J.) ("A right must exist before it can be reserved."), and the Trial Scheduling Order afforded the parties only the right to raise such objections in the Trial Scheduling Order. In such a context, a reservation of rights will not do. *In re Gayety Candy Co., Inc.*, 625 B.R.

390, 396 (Bankr. N.D. Ill. 2021) (Barnes, J.) ("One does not claim affirmative relief through a reservation of rights ….").

It should also be noted that Plaintiff did not make any later attempt to raise these objections. Had he done so, the court would have overruled the objection for these same reasons at that time.

C. Trial

As noted above, the court conducted the Trial on the matter on August 26, 27, 28 and 29, 2025.[6]

1. *Counts V and VI*

Two irregularities among the Operative Counts remained unresolved prior to Trial but appear to have been resolved in part by the manner in which the Plaintiff proceeded at Trial.

As noted above, when the court granted summary judgment to Defendant Spretnjak, the court found that Count V was pled solely as a collection remedy that would "only be valid if the Plaintiff is successful in obtaining a monetary judgment against one or both of the Defendants." Partial Summary Judgment Order at p. 9. It further stated that the "issue will not proceed unless the Plaintiff is successful on Count VI." *Id.* Perhaps as a result of those statements, neither the Defendants' Pretrial Statement nor the Plaintiff's Pretrial Statement addressed Count V of the Complaint and the Plaintiff made no attempt to address Count V at Trial.

While proceeding to trial on some but not all counts of a complaint with an unvoiced presumption that the court will permit the plaintiff to pursue remaining counts later constitutes an abandonment of those counts, *Desmond v. Keebler* (*In re Keebler*), 658 B.R. 908, 917 (Bankr. N.D. Ill. 2024) (Barnes, J.), the court recognizes the ambiguity of its prior statements regarding Count V. As a result, the court will not find that the collection remedy set forth in Count V is waived and considers it further in the discussion below.

With respect to Count VI, while both Defendants have been named in the Count, the Plaintiff's counsel stated at the beginning of the Trial that Defendant Spretnjak is "not a defendant to the spoliation count." Tr., vol. 1, p. 28. In reliance on that statement, in the Defendants' late-filed answer to Count VII, the Defendants state that: "Defendant Fletcher states that Defendant Spretnjak has been dismissed from this matter as Plaintiff's counsel informed the Court that she is no longer named as a party to the Spoliation claim under Count VI of the Fourth Amended Adversary Complaint." Count VII Answer at p. 1. The court agrees. While Defendant Spretnjak was never formally removed from Count VI, the statements by Plaintiff's counsel to the court at Trial and the assertion by Defendant's counsel in the Count VII Answer going unchallenged, combined with the fact that Plaintiff did not present any evidence with respect to Defendant Spretnjak at Trial or call her as a witness together result in Count VII being waived as against Defendant Spretnjak. *Keebler*, 658 B.R. at 917.

---

[6] A transcript for the Trial was produced and is relied on and cited to herein by the court (the "Transcript"). Citations to the Transcript herein are in format of "Tr., vol. [1, 2 or 3], pp. [X–Y]".

2. *The Rule 43(a) Motions*

Rule 43(a), states as follows:

> At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. *For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.*

Fed. R. Civ. P. 43(a) (emphasis added).

At the outset of the Trial on August 26, 2025, the Plaintiff attempted to hand a motion to the court seeking to take the testimony of Patricia Bulow (hereinafter, "Ms. Bulow") via Zoom. Given the surprise nature of the Plaintiff's motion, the court informed the Plaintiff's counsel that, while it would docket the motion, Plaintiff's Rule 43(a) Motion [Adv. Dkt. No. 176] (the "Original Rule 43(a) Motion"), it was the Plaintiff's responsibility to present the motion in full orally. The court considered therefore only the oral presentation of the motion (the "Oral Rule 43(a) Motion").

The essence of the Oral Rule 43(a) Motion was that one of the Plaintiff's witnesses, Ms. Bulow (the aunt of the Plaintiff and the Debtor, who had been an employee of the Debtor), could not appear in person. Tr., vol. 1, pp. 4–5. Counsel argued that when he talked to Ms. Bulow previously, she was located in Hammond, Indiana within 100 miles [of the court], but he had not talked to Ms. Bulow "for a while" and when speaking to her again, discovered that she had moved to Florida. *Id.* at 5. Counsel further argued that while Ms. Bulow was healthy and "very willing to testify" the next day via Zoom, she was unable to leave Florida due to her duties as a caregiver for her husband, who suffers from cancer and mobility issues, as well as her own inability to fly due to a blood-clotting condition. *Id.*

In response, the counsel for the Debtor pointed to the express terms of the Trial Scheduling Order, which states that "[u]nless otherwise ordered by the court *in advance of the trial*, all witnesses are required to be present in the courtroom for their testimony. Each party is responsible for issuing the requisite trial subpoenas to ensure the witnesses' attendance in the courtroom for the trial." Trial Scheduling Order at ¶ 5 (emphasis added). The Debtor also pointed out that the Original Rule 43(a) Motion was not supported by an affidavit from Ms. Bulow, and, therefore, consisted entirely of unsupported allegations.

In reply, the Plaintiff argued that allowing Ms. Bulow to testify remotely, rather than in-person, would not prejudice the Defendant. Further, the Plaintiff argued that the Defendants should not be surprised by her testimony because her testimony was discussed in both the "pretrial motion" and amended complaint of the Plaintiff, so the Defendants had been aware of her as a potential witness for a long time and had the opportunity to depose her. Finally, the Plaintiff argued that the last-minute nature of the request was due to having learned of the circumstances very recently himself and that, had the Rule 43(a) Motion been made "a week ago, or ten days ago, the circumstances wouldn't be any different." Tr., vol. 1, p. 6.

In considering the Oral Rule 43(a) Motion, the court found then and finds again now that the Plaintiff's arguments do an injustice to the processes and procedures established by the court.

Trials are not to be conducted by ambush. Due process requires adequate notice and a full and fair opportunity to be heard, and Plaintiff's last-minute request afforded neither to the Defendants. Further, the Plaintiff misses one major difference in circumstances. A motion prior to the commencement of the Trial would have been in keeping with the Trial Scheduling Order's express requirements.

In denying the Plaintiff's request, the court noted that had the timing been different, at least the Defendants would have had a better opportunity to respond to it. *Id.* It also noted that the circumstances that led to the last-minute request were entirely within the Plaintiff's control. It is not the court's, nor the Defendants', responsibility to manage the Plaintiff's case for him. Had the Plaintiff attempted to subpoena Ms. Bulow as he was specifically instructed to do by the Trial Scheduling Order, he would have learned about her new residence at that time. While Plaintiff's counsel argued that Ms. Bulow was not subject to a subpoena because she was "beyond 100 miles," Tr., vol. 1, p. 7, by his own admission, the Plaintiff's counsel did not know that until after the point when such a subpoena should have been issued. Last, the court agreed with the Defendants that the Original Rule 43(a) Motion consisted entirely of unsupported allegations regarding Ms. Bulow's circumstances and testimony.

As result, the court found that the Oral Rule 43(a) Motion failed to present compelling circumstances so as to satisfy Rule 43(a) and denied it without prejudice, noting that the Plaintiff remained free to file another such motion supported by actual proof of the circumstances alleged in the Rule 43(a) Motion. *Id.* at 8–9.

On the second day of the Trial, on August 27, 2025, the Plaintiff's Amended Verified Rule 43(a) Motion [Adv. Dkt. No. 177] (the "Amended Rule 43(a) Motion") was presented. Tr., vol. 2, p. 3. The Amended Rule 43(a) Motion attached a supporting "affidavit" made by Patricia Bulow, in which she described her relationship to the parties, what she could testify to, her willingness to testify remotely and her inability to travel to testify in-person due to her caregiving duties and personal medical condition. *Id.,* Exh. A (the "Bulow Declaration").

After hearing arguments from both the Plaintiff's counsel and the Defendants' counsel regarding the Amended Rule 43(a) Motion and taking a recess to consider the same,[7] the court denied the Plaintiff's Amended Rule 43(a) Motion. In so doing, the court stated six factors it had weighed in its analysis.

First, the court noted that while the Plaintiff failed to subpoena Ms. Bulow, he did subpoena other witnesses in the matter. Here, the court reminded the parties of the express requirement in the Trial Scheduling Order to issue requisite trial subpoenas. Trial Scheduling Order at ¶ 5.

---

[7] Due to a technical issue, audio was not recorded and a transcript could not be produced for the beginning portion of the second day of the Trial. Thus, the transcript for the second day of the Trial begins with the court's statement that "prior to taking a recess," the court was "given plaintiff's amended verified Rule 43(a) motion" and "heard arguments from plaintiff's counsel and defendants' counsel regarding that motion." Therefore, the transcript for the second day of the Trial begins at the point. To the extent necessary to supplement the missing portion of the transcript, the court relies on its own contemporaneous notes/recollections from the Trial.

Second, the court further noted that the Trial was set 105 days prior, on May 14, 2025. *Id.* There was, as a result, ample opportunity for the Plaintiff's counsel to discover the unavailability of Ms. Bulow during the period between the Trial being set in May of 2025 and the Trial commencing on August 26, 2025.

Third, the court observed that, given the large number of missed deadlines and delay in this matter, the court had taken the extraordinary step of stating that "[t]he trial will take place as scheduled. No further delays will be permitted." Denial Order. The Plaintiff, as the court explained, was therefore on notice of the importance of having all of his preparation complete in advance of the Trial.

Fourth, the court noted some of those missed deadlines and delays and observed that the Plaintiff had not received sanction for the same. In addition to the examples set forth above, the court noted that the Plaintiff did not deliver his trial exhibits to the court until August 25, 2025, when they were due on or before August 21, 2025. This happened despite the express language in the Trial Scheduling Order warning the parties of the harsh consequences of noncompliance. There the court stated that "[f]ailure to comply with the provisions of this order may result in waiver of claims or defenses, dismissal, default, exclusion or admission of evidence, or other sanctions, as justice may require. If the court does not receive the items set forth in this Order by the deadlines set forth herein, the court may strike the trial and/or order other relief." Trial Scheduling Order, p. 1. As a result, the court noted that further lenience in this matter was simply not warranted.

Fifth, while the court did note that it was accepting the Bulow Declaration for the purposes of considering the Amended Rule 43(a) Motion only,[8] the Bulow Declaration completely failed to address when Ms. Bulow became unavailable and thus did not assist the court in considering the propriety of the Amended Rule 43(a) Motion.

Sixth and last, the court explained that the Amended Rule 43(a) Motion contained no explanation of safeguards that the Plaintiff's counsel had taken in order to ensure the veracity of the witness's remote testimony. In this regard, the court considered an opinion from the District Court for the Eastern District of Wisconsin, which observed that:

> The Advisory Committee Note to the 1996 Amendment to Rule 43 emphasizes that contemporaneous transmission of testimony from a different location is permitted "only on showing good cause in compelling circumstances." Fed. R. Civ. P. 43 (Adv. Comm. Note 1996). The Committee Note acknowledges that "the very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling." *Id.* This is because "[t]he opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition." *Id.* As a result, "[t]ransmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial." *Id.*

---

[8] The court noted that while the Federal Rules of Civil Procedure would allow a motion in his regard based on facts outside the record to be predicated on an affidavit, the Bulow Declaration, while titled as an affidavit, was not made before a party with authority to administer oaths. 22 C.F.R. § 92.22. Nonetheless, though improperly titled, as a declaration, it was admissible in lieu of an affidavit as it appeared to meet the statutory requirements for the same. 28 U.S.C. § 1746.

> The Committee's Note further acknowledges that "the most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place." *Id.* Under such circumstances, "[c]ontemporaneous transmission may be better than an attempt to reschedule the trial, particularly if there is a risk that other—and perhaps more important—witnesses might not be available at a later time." *Id.* Finally, the Note states "a party who could reasonably foresee the circumstances offered to justify transmission of testimony will have special difficulty in showing good cause and the compelling nature of the circumstances." *Id.*

*Barbuto v. Ronquillo-Horton*, Case No. 22-C-569, 2024 WL 4212857, at *2 (E.D. Wis. Sept. 17, 2024). In *Barbuto*, the court denied a Rule 43 motion and denied a continuance for testimony at a later date when the witness might be available. *Id.*

The District Court in this District affirmed the importance of the last factor in the Advisory Committee note, that "[a] party who could reasonably foresee the circumstances offered to justify transmission of testimony will have special difficulty in showing good cause and the compelling nature of the circumstances." *Sec. & Exch. Comm'n v. Yang*, Case No. 12 C 2473, 2014 WL 1303457, at *4 (N.D. Ill. Mar. 30, 2014), *aff'd sub nom. S.E.C. v. Yang*, 795 F.3d 674 (7th Cir. 2015). In *Yang*, the District Court, in denying the Rule 43 motion, pointed out that the Advisory Committee Notes further state that "[n]otice of a desire to transmit testimony from a different location should be given as soon as the reasons are known, to enable other parties to arrange a deposition, or to secure an advance ruling on transmission so as to know whether to prepare to be present with the witness while testifying." *Id.*

Here, had the Plaintiff issued a trial subpoena as he was previously directed to do by the court, he would have known of the witness's unavailability at an earlier point in time. That would have allowed to the Defendants the opportunity to arrange a deposition or for the Plaintiff to allow the court the opportunity to consider this issue under less pressing circumstances. As a result, the last-minute nature of the Plaintiff's request did indeed prejudice the Defendants.

While the witness's circumstances, taken alone, might constitute cause for such a motion brought in a timelier manner, under all the facts and circumstances of this matter, they were not sufficient cause to permit remote testimony. For those reasons, the court denied the Amended Rule 43(a) Motion.[9]

This, unfortunately, is not the end of this discussion. At Trial, the court noted that in the Original Rule 43(a) Motion, the Amended Rule 43(a) Motion and the Bulow Declaration, the Plaintiff's counsel had used the phrase "n***** rigged." The redaction of the term is done by the court here for the sake of propriety, but the unredacted term was used by the Plaintiff's counsel.

---

[9] In making its ruling, the court noted that, due to the witness's health, if she "cannot be present or testify at the trial or hearing because of a then-existing infirmity, physical illness, or mental illness," Fed. R. Evid. 804(a)(4), her testimony might be available to be admitted pursuant to Fed. R. Evid. 804(b)(1). Tr., vol. 2, p. 247. That, the court stated, would be for the Plaintiff to establish. *Id.* The court notes that the Plaintiff took no steps in that regard.

The Plaintiff's counsel, as an officer of the court, has an obligation to "speak and write civilly and respectfully in all communications to the court." *Butler v. Eddi*, Case No. 25-2589, 2025 WL 3853040, at *1 (7th Cir. Nov. 7, 2025). Counsel could have easily conveyed the witness's testimony without the use of the scurrilous phrase and failed in his duty to the court by filing two motions and an affidavit (presumably drafted by counsel) containing it. It does not matter if that term was used by the witness. By including the term in his filings where there was no need to do so, the use of the term became counsel's error and counsel's responsibility. The court therefore informed counsel at Trial that he bore an affirmative obligation to redact that phrase from the record created by him.

As of the date of this Memorandum Decision, however, counsel has failed to act to correct the record.

3. *Exhibits*

At the Trial, Plaintiff's Exhibits 1, 6 and 8 were admitted into evidence without any objection. The Defendants objected to admission of the Plaintiff's Exhibit 3 on the basis that they had never seen it. The court admitted Plaintiff's Exhibit 3, subject to any objections raised and accepting that some dates in column G thereof would need to be corrected. See Px. 3. Plaintiff's Exhibit 4, with which the Defendants objected to the extent that the Exhibit was used to confirm the content, but not to the extent of judicial notice to confirm its existence, was admitted within the bounds of judicial notice. As Plaintiff's Exhibits 2, 5, 7 and 9 were not raised at the Trial, the court will not consider them now.

The Defendants' Exhibits 1, 2, 4, 5, 6 and 7 were admitted without any objection or limitation. As with the Plaintiff's Exhibits not raised at Trial, the court will not consider now Defendants' Exhibits 3 and 8 not raised at Trial.

Further, at the beginning of the Trial, the Plaintiff tendered to the court Plaintiff's Supplemental Authority [Adv. Dkt. No. 178] filed on August 26, 2025 (the "Supplemental Authority"). That Supplemental Authority, which consists of a list of cases and some opinions in full, was not objected to by the Defendants but is not evidentiary in nature. Some of the cases provided in full had unexplained highlighting on them, but otherwise no explanation by counsel of why these cases were germane to the matters before the court. Without context, the Supplemental Authority is of very little use. The court, when it could, nonetheless considered the cases as appropriate when taking up the legal issues before it.

4. *Witnesses*

During the Trial, the court heard from five witnesses, as follows:

For the Plaintiff:

John D'Agguano, the Plaintiff;
Christopher E. Fletcher, the Debtor;
Vicky (Fletcher) Koncir ("Vicky"), sister of the Debtor; and
Don Fletcher ("Don"), brother of the Debtor.

For the Defendants:

Christopher E. Fletcher, the Debtor.

a. Vicky

The first witness called at Trial during the Plaintiff's case-in-chief was Vicky. Vicky testified to her identity, age, siblings and family relationships, identifying the Debtor as her older brother and the Plaintiff as the cousin of both her and the Debtor. Vicky also testified to the breakdown of her relationship with the Debtor, with whom she had not spoken to since approximately 2009. Vicky testified extensively as to work she performed for the Debtor and her understanding of his real-estate business operations, her understanding of her role in that business and her related compensation, her involvement in the refinancing of several properties between approximately 2006 and 2009, her knowledge of the Plaintiff's loan to the Debtor and her knowledge of the heated conversions. The court was left with no reason to question the veracity of Vicky's testimony.

b. Don

The next witness called by the Plaintiff was Don. Don testified to his age, identity, siblings and professional background. Don testified to his recollection of a 2005 lunch meeting with the Debtor at which he and the Debtor discussed the Debtor's desire and need to borrow money, which he understood to be related to the Debtor's issues with gas service for the Debtor's rental properties. Don also testified with respect to his knowledge of the Debtor's alleged diversion and theft of gas from People's Gas. Don's testimony regarding the gas situation was initially that he recalled conversations with the Debtor about a "situation" the Debtor was having with one of the buildings and the Debtor's need for roughly $35,000.00 to either have the gas service restored after being shut off, or to convert the heating infrastructure from gas to electric. During the Plaintiff's direct examination of Don, the Plaintiff's counsel attempted to elicit more specific testimony from Don about the gas situation and the alleged re-routing of a pipe around a meter. Don stated that he did not recall the Debtor specifically saying that he had re-routed the pipe, but repeatedly qualified his answers with having limited knowledge of the situation, not remembering who he learned about the situation from or when he learned of it and, eventually, the court found that Don was evading questions and granted a request by the Plaintiff to have Don declared to be a hostile witness for purposes of allowing leading questions. Tr. vol. 1, p. 190, line 11-25; Tr. vol. 1, p. 193, line 11-15.

While Don ultimately testified, after being declared a hostile witness, that he learned about the Debtor re-routing the gas from the Debtor himself, he testified unequivocally that he did not personally observe the Debtor re-routing the gas and had no first-hand knowledge of any such activity, rather anything he knew about the situation was conveyed to him by someone else. The court, being left with the impression that Don was evading the Plaintiff's question, directed Don to recount what he had previously told the Plaintiff's counsel – a subject of much of the direct examination of Don. Don then agreed that he had recently told the Plaintiff's counsel during a phone call that the Debtor told him he had re-routed gas around the People's Gas meter, but he did not know when the Debtor told him as much. Thus, Don ultimately testified that he had attributed the gas rerouting statement to the Debtor previously, qualified with repeated uncertainty regarding when the statement was made, whether his current memory supported the Debtor being the source of the information and whether his recollection had become mixed with information received from other family members. Don also testified that he and the Debtor were estranged and had not spoken since approximately 15 years prior to the Trial, conceding that his ability to accurately recall the precise details of conversations in 2005 had been disadvantaged by the passage of time.

In sum, the court was given ample reason to question the veracity of Don's testimony, especially on the subject of the potential rerouting of the gas lines at the Ellis Property.

c. The Plaintiff

The next witness to be called during the Plaintiff's case-in-chief was the Plaintiff, John D'Aguanno. The Plaintiff identified the Debtor, Vicky and Don as his cousins whom he had known since childhood. The Plaintiff testified that he had come into the money he eventually loaned his cousin as proceeds of prior, unrelated litigation. He testified about his relative lack of sophistication at the time he made the Loan, having never loaned money to another person or entered into any sort of comparable business contract and his primary experience with debt limited to ordinary credit card and student loan obligations. He further testified that the Loan he made to the Debtor arose out of general conversations between the two regarding the Plaintiff's interest in investing in property. Those conversations eventually led to the cousins meeting at an IHOP by the freeway in the Lamont, Illinois area (the "IHOP Meeting").

The Plaintiff further testified that it was at the IHOP Meeting that the Debtor first asked for $150,000.00 and that no further discussions regarding the Loan prior to it being made took place. He testified that Vicky was never present for any conversation concerning the Loan. According to his testimony, the Plaintiff understood from the Debtor's request that the Debtor needed the money to convert the Ellis Property from gas to electric heat. On cross-examination, the Plaintiff clarified this testimony to indicate that the money was also needed for windows. Nonetheless, the Plaintiff insisted that the money was being loaned for rehabilitation of the Ellis Property and there was never communication authorizing the Debtor to use the proceeds of the Loan for personal use or for other buildings.

Regarding the Note, the Plaintiff testified that the principal requested and the proposed interest rate, monthly payment amount and repayment period were all proposed by the Debtor. According to the Plaintiff, no negotiation of those terms took place and the Debtor subsequently summarized the agreed terms in an email. Those terms became the terms of the Note. The Plaintiff testified that he considered the interest rate the Debtor proposed to be high, which prompted him to question the Debtor as to why monthly payments would be required in addition to the interest. Although the Plaintiff did not claim to understand why the Debtor chose such a high interest rate, he testified that the Debtor explained that a monthly payment requirement would encourage him to pay the debt off sooner rather than later.

The Plaintiff further testified that, at the time he made the Loan, he believed the Debtor was the sole owner of the Ellis Property and an honest, solvent businessman with a positive net worth and ability to repay the Loan. The Plaintiff claimed that the Debtor did not disclose that tenants had moved out due to loss of heat or that income had begun to materially decline. The Plaintiff testified that such facts certainly would have been material to his decision to make the Loan and any such knowledge would have prevented him from making the loan.

Regarding the gas issue, the Plaintiff testified that the Debtor did not disclose any problems or disputes with People's Gas. He testified that he initially learned of it from Don.

As to the Debtor's use of the Loan proceeds, the Plaintiff testified that the language in the Note relating to the use of proceeds was material to his decision to make the Loan. He testified that

he did not actually know whether proceeds from the Note were being used by the Debtor for personal expenses, but he "hoped" such proceeds were being used for the promised work on the Ellis Property.

The general impression left by the Plaintiff is that he was mostly truthful in his testimony, though the testimony regarding the terms of the Note, the IHOP Meeting and his actions toward the Ellis Property all appeared embellished for the purposes of proving his case against the Debtor.

d. The Debtor

The Debtor was the final witness called during the Plaintiff's case-in-chief and was the only witness called in the Debtor's defensive case. The Debtor's testimony initially centered around his discovery response stating that he could not access bank records over seven years old and that he had destroyed most remaining relevant documents in the wake of the Chapter 7 Case and foreclosure of the real estate. He testified that after the foreclosures and the Chapter 7 Case, he simply no longer believed he needed such documents. As Plaintiff's counsel pressed him regarding the breadth of his statement and whether it was true as of the Trial, the Debtor maintained the accuracy of the statement, though his answers consistently reflected uncertainty about precisely what records were destroyed versus which may be obtainable.

Plaintiff's counsel continued to press the Debtor about the selection of records produced by the Defendants with a focus on duplicate copies produced of certain checks and gaps in the sequence of others, challenging whether the Debtor had truly produced all available records or only selected certain items. The Debtor testified that once he learned litigation had been filed, he searched for all the records he still possessed and at least some of the check images produced were obtained from physical bank records or statements he had in his possession. In his testimony, the Debtor acknowledged that he produced some checks, rather than every check associated with the account, explaining that he selected the documents produced by looking for items related to the properties or expenditures he believed were relevant, rather than producing every bank statement from which the check images came. The Debtor disputed any suggestion that he had deliberately withheld documents.

A considerable portion of the Plaintiff's examination of the Debtor during its case-in-chief focused on the April 30, 2016, $1,000.00 check (the "2016 Check") and its characterization. The Debtor testified that he regarded the 2016 Check as a gift, or assistance with the Plaintiff's tuition, rather than as a payment on the Note. Through his testimony regarding the 2016 Check, the Debtor maintained his characterization that it was a gift motivated by a desire to help family out, including his gratitude for the Plaintiff's earlier loan to him.

Another primary focus of the Plaintiff's direct examination of the Debtor was regarding the communications between the Debtor and the Plaintiff in the time period after the Chapter 7 Case, between 2015 and 2018, in which the Plaintiff frequently asked the Debtor for money and the Debtor frequently responded with speculation about business transactions that may close, money that may become available and amounts he might be able to send the Plaintiff. The Debtor's testimony consistently resisted the Plaintiff's characterization of every request for money during the 2015-to-2018-time frame amounting to an effort to collect on the Note. The Debtor testified that it was his position that, after the Chapter 7 Case, he believed that he no longer legally owed the debt to the Plaintiff and understood at least some of the Plaintiff's requests for money to be requests for

personal help. With respect to why he continued to discuss anticipated business transactions, proceeds and the possibility of future payments if the communications were only regarding gifts, the Debtor testified that the Plaintiff frequently contacted him, he wanted to help the Plaintiff out and he sometimes discussed business because they were family and enjoyed a close relationship. He consistently maintained his disagreement that these discussions constituted promises to repay the Note. The Debtor's testimony regarding the details of the messages during the 2015-to-2018-time frame is consistently underscored with his acknowledgment that he did not remember the exact context or precise transactions of individual messages he was examined about.

In his testimony, the Debtor acknowledged that the Plaintiff was not listed as a creditor and consequently, not given formal notice of the Chapter 7 Case. Generally, the Debtor's testimony reflected that he had trusted an attorney to handle the Chapter 7 Case and thus, could not explain why everything happened the way it did in the Chapter 7 Case with great certainty. The Debtor consistently maintained that the omission of the Plaintiff from his Chapter 7 Case was not intentional or an attempt to secretly discharge the debt by preventing notice; rather, he relied on the advice of counsel and believed the debt or collateral had already been addressed throughout the foreclosures.

The Debtor testified regarding the Note and its terms and the negotiations between the Plaintiff and the Debtor regarding the same. He testified as to the payments to the Plaintiff and their sources. With respect to the origin of the $115,000.00 he paid to the Plaintiff during 2007, the Debtor testified to the payments being funded with proceeds from the refinancing of two of the Properties. The Debtor also testified to funding the $60,000.00 payment made on August 10, 2007, with money he borrowed from his mother-in-law. With respect to the 2016 Check he sent to the Plaintiff, the Debtor testified that he made the payment in the amount he had available to give at that time because the Plaintiff told him he needed money for his tuition.

He further testified regarding the Home (the collateral for the Note) and the foreclosure regarding the same. The Debtor was unable to recall precisely when the Home was foreclosed but speculated that it might have occurred in 2010 or 2011. He testified that by the time he filed the Chapter 7 Case in 2014, the Home had been lost to foreclosure and he had been evicted from it. He could not recall whether he had ever personally told the Plaintiff about the foreclosure proceedings attached to the Home, but he believed that the bank that foreclosed on the Home had given the Plaintiff notice of the proceedings.

The Debtor testified regarding his financial management and operation of his businesses and as to his various bank accounts and the commingling of funds therein. He testified to the structure of accounts, including that the account that was being used for operating the business was an account that was in his name, personally. Regarding the lack of records associated with the Debtor's business transactions, the Debtor testified to having lost records that were physically located at one of the Properties sometime around 2009 or 2010 when a receiver was appointed. He also testified to throwing out some records at some point prior to the filing of this Adversary, couched with acknowledgment that he could not actually be sure which records went missing for which specific reasons.

During his defensive case, the Debtor further testified as to issues relating to the Ellis Property, including the heating and electrical conversion issues. He testified to having issues providing tenants at the Ellis Property with heat between 2005 and 2007, resulting in an exodus of

tenants during the same period. He testified as to the tenant litigation, judgments and bankruptcy, including making the decision not to defend against a lawsuit filed by former employees because the property management business had already failed, which eventually resulted in a default judgment being entered against him. He denied the allegation that he had rigged the gas connections at the Ellis Property to steal gas.

Regarding the 2016 Check, on defense, the Debtor testified that he sent it because the Plaintiff had called and asked for money to pay his tuition. He recalled that the Plaintiff had requested $2,000.00, but he had sent $1,000.00 because it was the amount he could afford to spare at the time. He testified that by the time the Plaintiff was asking him for money in 2016, he did not believe it was a request for repayment of the Loan because he believed that the debt associated with the Loan had been discharged in his bankruptcy.

Last, the Debtor testified to Vicky's role and financial benefits with respect to the property management business. According to the Debtor's testimony, Vicky received economic benefit from her work for the property management business in the form of equity in the properties.

The general impression left by the Debtor is that he too was mostly truthful in his testimony, though his testimony regarding the 2016 Check and its characterization and his communications with the Plaintiff regarding repayment were simply not believable. The court did not detect any dissimulation regarding his reliance on counsel in his Chapter 7 Case and the failure to schedule the Plaintiff therein.

5. *Judgment on Partial Findings*

After the Plaintiff had rested his case in chief, on August 28, 2025, the Defendants moved for judgment on partial findings under Civil Rule 52(c). Defendant's Motion for Judgment on Partial Findings Pursuant to FRCP 52(c) [Adv. Dkt. No. 181] (the "Rule 52(c) Motion"). The Rule 52(c) Motion seeks judgment in favor of the Debtor and against the Plaintiff on all of the Operative Counts.

In the Rule 52(c) Motion, the Defendants attacked the Plaintiff's premise that there had been fraud in the inducement of the loan in light of the Debtor's failure to disclose various alleged misdeeds. It argues that that the Trial record contains no evidence to support the Plaintiff's theory that the Debtor obtained the Loan through false pretenses. It argues that, instead, the evidence adduced by the Plaintiff indicated that that the Debtor wanted to repay the Plaintiff and that the Loan was used for the alleged, intended purpose, to switch the building from gas to electric heating. It asserts that the Plaintiff's own testimony reflects that he was unaware of any alleged gas theft until after the Loan had been made when he allegedly learned about it from Don. Don's testimony, however, was that he had no knowledge of any gas theft.

Accordingly, the Rule 52(c) Motion asserts that the Plaintiff did not meet its burden with respect to direct or circumstantial evidence that the loan was obtained under false pretenses, pursuant to section 523(a)(2)(A). The Rule 52(c) Motion argues that this court must consequently dismiss all of the Operative Counts.

Rather than set briefing on the Rule 52(c) Motion, the court "decline[d] to render any judgment until the close of evidence." Fed. R. Civ. P. 52(c).

D. Posttrial Closing Statements

At the conclusion of the Trial, the court set a deadline for filing written closing statements with the court, Scheduling Order [Adv. Dkt. No. 183], which statements were timely filed. Defendant's Statement of Written Closing [Adv. Dkt. No. 191]; Plaintiff's Memorandum Closing Argument [Adv. Dkt. No. 193].

Upon the filing of those closing statements, the entire matter was taken under advisement. This Memorandum Decision constitutes the court's determination after the Trial of the matters in the Amended Complaint and concludes all open issues in the Adversary, including, as applicable, the Rule 52(c) Motion.

## FINDINGS OF FACT[10]

From the review and consideration of the procedural background, as well as the evidence presented at the Trial and the filings in this Adversary, the court determines the salient facts to be and so finds as follows:

1. The Plaintiff and Debtor are individuals. Plaintiff's Pretrial Statement, p. 3.
2. The Plaintiff is the Debtor's first cousin. *Id.*
3. The Plaintiff and the Debtor have known each other since childhood. *Id.* at ¶ 12, Tr., vol. 1, p. 203.
4. The Parties agree that venue and jurisdiction are proper because the Debtor filed a personal chapter 7 bankruptcy petition in the Northern District of Illinois and all matters at issue in the loan transaction took place in the Northern District of Illinois. Plaintiff's Pretrial Statement, p. 3.
5. The Defendants are spouses and were married in 1999. *Id.*
6. Prior to his marriage to Defendant Spretnjak, the Debtor purchased the condominium located at 6740 S. Oglesby, Chicago, Illinois for his residence. *Id.*
7. The Debtor was a real estate investor and property manager. Defendants' Pretrial Statement, p. 2.
8. The Debtor, together with his siblings, owned the Properties; four commercial properties in Chicago. Tr., vol. 1, pp. 86–92, 135–138.
9. Vicky is the younger sister of the Debtor and cousin of the Plaintiff. Tr., vol. 1, p. 59.
10. Vicky and the Debtor have not spoken since some time in 2009. Tr., vol. 1, p. 61.
11. Beginning around 2002, Vicky helped the Debtor by performing work related to the property management business when needed but was not a regularly paid employee. Tr., vol. 1, pp. 62–64.

---

[10] Adjudicative facts may also be found and determined throughout this Memorandum Decision. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

12. In exchange for her work with the property management business, Vicky received economic benefit in the form of equity in the buildings. Tr., vol. 3, p. 589.

13. The four commercial Properties owned by the Debtor and his siblings were all purchased prior to the marriage of the Defendants. Tr., vol. 2, pp. 427–32.

14. The Ellis Property is one of the Properties that was owned by the Debtor and his siblings. *Id.* at 432.

15. The Debtor was unable to provide tenants at the Properties with heat during the period of 2005 to 2007 and as a result, a number of tenants moved out. Tr., vol. 3, p. 570.

16. Around 2005 and 2006, Vicky recalled that there were frequent issues with heat at the Properties because they were older buildings with older boilers. Tr., vol. 2, p. 162.

17. In 2006, the Debtor requested a loan from the Plaintiff. Answer, ¶ 17.

18. The Debtor discussed the gas being turned off when he requested a loan from the Plaintiff in relation to his need for funding to convert the heating at the Properties from gas to electric. Tr., vol. 3, pp. 568–69.

19. The Plaintiff and the Debtor discussed the Debtor's desire to convert the heating from gas to electric at the Properties so that tenants would pay their own individual heating bills when discussing the Debtor's request for a loan. *Id.* at 602–03.

20. On March 31, 2006, the Plaintiff and the Defendants signed the Note; a promissory note, dated April 1, 2006, in the amount of $150,000.00 and due to the Plaintiff on December 31, 2006. Note, p. 4.

21. The Defendants are jointly and severally liable as borrowers on the Note. *Id.* at 1.

22. The Note granted the Plaintiff a security interest in the Home. *Id.* at 2.

23. The Plaintiff's security interest in the Home was recorded on March 31, 2006. Mortgage, Px. 1, p. 5.

24. The initial interest rate was 47.2% pursuant to the Note. Note, p. 1.

25. The default interest rate was 52.2% pursuant to the Note. *Id.*

26. The Loan matured and came due in full on December 31, 2006, pursuant to the Note. *Id.*

27. The Note contains a provision that "[Defendants] warrant[] and represent[] to [Plaintiff] that [Defendants] shall use the proceeds represented by this Note solely for purpose of making improvements to the multifamily apartment building located at 8000 S. Ellis, Chicago, IL 60619." *Id.*

28. The Note contains no commercial covenants or terms that would allow the Plaintiff to monitor or control the use of the proceeds of the Loan. *Id.*

29. The Plaintiff never visited the Ellis Property before he made the Loan. Complaint, ¶ 25; Tr., vol. 1, p. 212; Tr., vol. 2, p. 255.

30. The Plaintiff never asked the Debtor for documents to verify financial information regarding the Ellis Property prior to making the Loan. *Id.* at 251–52.

31. At the time the Note was executed, the Plaintiff assumed that the Properties were all owned by the Debtor despite not searching public title records or otherwise independently verifying ownership. Tr., vol. 3, pp. 624–625.

32. Prior to execution of the Note, the Plaintiff's sole concern was whether or not there was sufficient equity in the collateral that was put up, the House. Tr., vol. 2, pp. 251, 254.

33. The Debtor did not make any representations to the Plaintiff regarding the financial status of the Debtor's business prior to execution of the Note. *Id.* at 253.

34. The Plaintiff was represented by a lawyer in the drafting and execution of the Loan. Tr., vol. 1, p. 209.

35. In making the Loan, the Plaintiff relied on his lawyer to provide him with necessary information, including that there was enough equity in the Home to cover the amount the Debtor would borrow. Tr., vol. 2, p. 254.

36. The Plaintiff testified that the Debtor never told him about the Debtor's issues with People's Gas, that the gas had been shut off at the Properties and that tenants had moved out during the winter. Tr., vol. 3, pp. 609–10.

37. The Plaintiff testified that he would not have made the Loan had he been aware of the issues regarding People's Gas. *Id.*

38. The Debtor used a checking account that was in his name personally for business operations. *Id.* at 260.

39. A default judgment in the amount of $121,521.32 was entered against the Debtor and in favor of People's Gas on August 27, 2007 (the "People's Gas Judgment"). Px. 4.

40. The nature of the claims underlying the People's Gas Judgment is not apparent on its face. *Id.*

41. The People's Gas Judgment "destroyed" the Debtor's credit. Tr., vol. 2, p. 455.

42. Around 2006, Vicky assumed personal liability for substantial mortgage debt in a refinance of one of the four commercial properties (the "Refinance"). Tr., vol. 1, p. 76.

43. Vicky became a guarantor with respect to the Refinance because the Debtor's credit was terrible following the People's Gas Judgment. Tr., vol. 2, pp. 455–56.

44. While Vicky was not sure where the cash proceeds of the Refinance ultimately went, she understood that the purpose of the Refinance was to pay the Plaintiff back. Tr., vol. 1, pp. 78–79.

45. Sometime around 2007, Vicky wired a $60,000.00 payment to the Plaintiff at the Debtor's direction. *Id.* at 172. This was the only payment from the Debtor to the Plaintiff that Vicky was personally aware of. *Id.* at 177.

46. The Debtor made a payment to the Plaintiff on August 10, 2007, in the amount of $60,000.00. Px. 6 (the "Amortization Schedule").

47. The Debtor borrowed money from his mother-in-law to fund the August 10, 2007, payment to the Plaintiff. Px. 1; Tr., vol. 2, p. 459.

48. The purpose of the Refinance was to repay the Plaintiff. Tr., vol. 2., p. 457.

49. In 2007, the Debtor made a total of $115,000.00 in payments on the Loan, some of which were funded by the Refinance. Amortization Schedule; Tr., vol. 2, pp. 458–459.

50. In 2008, the Debtor made a total of $7,085.00 in payments on the Loan. Amortization Schedule.

51. On March 20, 2009, the Debtor made a $1,000.00 payment to the Plaintiff. *Id.*

52. The Debtor admitted that the March 20, 2009, payment made to the Plaintiff was a loan repayment. Tr., vol. 2, p. 302.

53. After the Loan was made in 2006, to and including the year of 2009, the Debtor made a total of $123,085.00 in payments to the Plaintiff on the Loan (the "Total Payments"). *Id.*

54. The Plaintiff asserts that the Total Payments are comprised of interest paid in the amount of $109,252.50 and payment toward principal in the amount of $13,832.50. *Id.*

55. The Debtor lost his interest in all of the Properties he owned together with his siblings prior to the commencement of the Chapter 7 Case. Tr., vol. 2, p. 439.

56. By 2014, the Debtor had lost the Home to foreclosure and had been evicted from it. *Id.*

57. The Plaintiff testified that he never received notice of the foreclosure of the Debtor's Home. *Id.* at 269.

58. The Debtor did not recall whether or not he ever personally informed the Plaintiff of the foreclosure proceedings attached to the Home. Tr., vol. 3, p. 504–06.

59. The Debtor believed that the bank that foreclosed on the Home had given notice of the foreclosure to the Plaintiff because the Plaintiff was "on the mortgage." *Id.*

60. The Debtor did not recall when the Home was actually foreclosed on but speculated that it might have been in 2010 or 2011. *Id.* at 505.

61. Prior to the foreclosures, the Debtor maintained an office at one of the commercial properties (the "Office"). *Id.* at 440.

62. The Debtor used the Office more as a storage location than a work location. *Id.* at 439.

63. Items, including keys, leases and receipts, were kept at the Office. *Id.*

64. At least some bills were sent to the Office. *Id.*

65. During the foreclosures, a receiver was appointed and took over the buildings which caused the Debtor to be locked out of the office and permanently lose access to any physical records that were located therein. *Id.* at 440.

66. After being locked out, the Debtor was never allowed back into the Office to retrieve records. *Id.*

67. The Debtor threw out some financial records at some point prior to the filing of the Adversary. *Id.* at 461.

68. The Debtor is unsure of the precise manner and time by which specific records were lost. *Id.* at 462.

69. The gas service at the Ellis Property and the other three Properites was disconnected sometime during 2005 by People's Gas. *Id.* at 408–409.

70. The gas-to-electric heat conversion work at the Ellis Property was complete for all units sometime around March of 2007. *Id.* at 409–411.

71. The Debtor introduced photos showing the converted baseboard heating at the Ellis Property. *Id.* at 447–449; Dx. 6.

72. An electrical contractor hired for the heat conversion work was paid for significantly more work than it actually completed. Tr., vol. 2, p. 416.

73. The Debtor made at least nine payments totaling $98,725.00 to contractors for work on the commercial properties, including the heat conversion work at the Ellis Property and the other Properties. Px. 1; pp. 21–23.

74. People's Gas never restored service at any of the Properties. Tr., vol. 2, p. 412.

75. The Debtor testified that he never turned on the gas at the Properties during the winters when tenants were without heat in 2005 and 2006. Tr., vol. 3, pp. 583–84.

76. Vicky did not personally witness any events related to the Debtor stealing gas at any of the commercial properties. Tr., vol. 1, p. 175.

77. Any awareness Vicky had of situations surrounding People's Gas came from the Debtor. *Id.*

78. The Plaintiff was made aware of the Debtor's alleged gas theft by Don sometime after the Loan was made. *Id.* at 217, Tr., vol. 2, p. 258.

79. The Debtor testified that he never told Don that he was stealing gas from People's Gas in relation to the Ellis Property after the gas service was terminated. Tr., vol. 3, p. 493.

80. The Plaintiff never personally witnessed the Debtor tamper with the gas line in any way. Tr., vol. 2, pp. 257, 259.

81. Any knowledge the Plaintiff had regarding any sort of dishonest business practice of the Debtor was not personal knowledge. *Id.* at 268.

82. Vicky understood that the Debtor had a goal of converting the commercial properties from natural gas to electric heat from the Debtor's statements to her. Tr., vol. 1, p. 175.

83. Vicky believed that the Plaintiff's loan to the Debtor was for the work required to convert the heat system at the Ellis Property from gas to electric because of the Debtor's statements. *Id.* at 176–177.

84. The Plaintiff had no knowledge of the Loan proceeds being used for the Debtor's personal expenses. *Id.* at 220.

85. The Plaintiff did not know whether the Debtor used the proceeds of the Note to pay off another loan because he never verified that information. Tr., vol. 2, pp. 261–262.

86. The Debtor never told Vicky that he did not ever intend to repay the Plaintiff. Tr., vol. 1, p. 177.

87. The Plaintiff was aware that the Debtor was in default with respect to the Note as of December of 2006. Tr., vol. 2, p. 266.

88. The Plaintiff was aware of his potential breach of contract case against the Debtor in December of 2006. *Id.* at 267.

89. After the Debtor defaulted on the Note, the Plaintiff was unwilling to foreclose on the Home because of the reassurances that the Debtor gave him and because he knew that doing so would have a detrimental impact on the Debtor and Debtor's family. *Id.*

90. Vicky told the Debtor that she would no longer perform work with respect to the rental properties after she found out about the foreclosures. Tr., vol. 1, p. 130.

91. In February or March of 2009, Vicky learned that she was the sole guarantor for a loan secured by one of the rental properties after being contacted by a lawyer involved in the foreclosure. *Id.* at 142.

92. Before learning that she was the sole guarantor, the Debtor had told Vicky that the LLC form of the property management business protected her and she was not personally liable. *Id.*

93. Vicky and the Debtor stopped speaking sometime in 2009 due to a disagreement regarding Vicky informing the Plaintiff about the foreclosures. Tr., vol. 1, p. 153.

94. Sometime in 2009, in the midst of the foreclosures, Vicky informed the Plaintiff of the foreclosures because she felt he should be aware. *Id.* at 152-54.

95. Vicky believed that the Debtor was angry with her for disclosing the foreclosures to the Plaintiff. *Id.* at 153.

96. The Plaintiff testified that in 2016, he was not aware that the Properties had been foreclosed on. Tr., vol. 3, pp. 622–23.

97. Prior to the Chapter 7 Case, the Debtor was sued by two former employees for wage theft. *Id.* at 588.

98. The Debtor chose not to defend the lawsuit because the Properties had already been lost to foreclosure. Tr., vol. 3, p. 592.

99. A default judgment in the amount of $149,000.00 was entered against the Debtor in favor of former employees of the Debtor prior to the Chapter 7 Case being filed. Tr., vol. 3, p. 588.

100. The Property foreclosures occurred around 2009. Tr., vol. 2, p. 439.

101. By 2014, the Properties had been foreclosed on. *Id.*

102. By 2014, the Debtor's Home had already been foreclosed on and he had already been evicted from it. *Id.*

103. On May 16, 2014 (the "Petition Date"), the Debtor commenced the Chapter 7 Case. Voluntary Petition [Dkt. No. 1].

104. The Debtor was motivated to file the Chapter 7 Case because he had "just lost everything" and wanted a clean, new start. Tr., vol. 2, p. 450.

105. The Debtor was represented by attorney Micheal E. Fleck ("Fleck"), when the Chapter 7 Case was filed. *Id.*

106. The Debtor knew Fleck prior to the Petition Date because he was represented by Fleck through a loan modification during the foreclosure process, and thus Fleck was familiar with the foreclosures of the Home and other Properties. Tr., vol. 2, pp. 449-450.

107. On the Petition Date, Fleck was suspended from the practice of law by the Supreme Court of Illinois. Motion to Withdraw [Dkt. No. 13]; Tr., vol. 2, pp. 449-450.

108. Fleck's motion to withdraw from the Chapter 7 Case was misdocketed and miscalendared by Fleck and the hearing on it was stricken. *Id.*; Hearing Stricken [Dkt. No. 15].

109. The Motion was never reset for hearing. [Dkt. No. 1, *et seq.*].

110. The Plaintiff was not scheduled as a creditor in the Chapter 7 Case. *Id.*

111. Peoples Gas was not scheduled as a creditor in the Chapter 7 Case, though the Debtor did note the judgment to Peoples Gas in his Statement of Financial Affairs. Voluntary Petition, Statement of Financial Affairs [Dkt. No. 1].

112. A number of other judgments, each several years prior to the commencement of the Chapter 7 Case, were also noted. *Id.*

113. The Debtor scheduled unsecured debt of over $100,000.00. Voluntary Petition, Schedule F [Dkt. No. 1]

114. The Plaintiff did not receive notice of the commencement of the Chapter 7 Case because he was not scheduled as a creditor in the Chapter 7 Case. Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines [Dkt. No. 9].

115. The Debtor believed that Fleck had given the Plaintiff notice of the Chapter 7 Case. Tr., vol. 2, p. 309.

116. At the meeting of creditors, an attorney appeared for the Debtor whom the Debtor had never met before the meeting of creditors. Tr., vol. 2, pp. 311, 453.

117. That attorney did not appear on behalf of the Debtor in the Chapter 7 Case. [Dkt. No. 1, *et seq.*].

118. The chapter 7 trustee found no assets to distribute in the Chapter 7 Case. Chapter 7 Trustee's Report of No Distribution [Dkt. No. 17].

119. On December 18, 2014, the Debtor was granted a discharge in the Chapter 7 Case. Discharge Order [Dkt. No. 29].

120. On December 22, 2014, the Chapter 7 Case was closed. Bankruptcy Case Closed and Trustee Discharged [Dkt. No. 31].

121. On November 12, 2019, the Plaintiff commenced the State Court Proceeding. Motion Pursuant to 11 U.S.C. § 523(a)(3)(B) to Modify Stay as to Omitted Fraudulently-Induced Debt, Exh. D [Dkt. No. 35].

122. The Debtor was unaware that the Plaintiff had not been listed as a creditor in his Chapter 7 Voluntary Petition until the Plaintiff commenced his action in 2019. Tr., vol. 2, p. 312.

123. On August 10, 2020, the court reopened the Chapter 7 Case on the Debtor's motion to reopen. Order Granting Motion To Reopen Chapter 7 Case [Dkt. No. 40].

124. On September 8, 2020, the Plaintiff commenced the Adversary. Complaint [Adv. Dkt. No. 1].

125. On March 28, 2022, the State Court Proceeding was removed to the United States District Court for the Northern District of Illinois and referred to the undersigned. Order of Referral from the U.S. District Court.

126. The Order of Referral thereby commenced adversary case 22ap00049. *Id.*

127. On April 12, 2022, the court consolidated the Removed Case into the Adversary. Order Consolidating Adversary Proceedings [Adv. Dkt. No. 58].

128. The Debtor admitted that he could not access any bank records more than seven years old and had destroyed the majority of the remaining relevant documents following the foreclosures and the Chapter 7 Case. Tr., vol. 2, pp. 275–277, Px. 1, p. 45.

129. None of the Debtor's banks produced any documents responsive to the Plaintiff's discovery requests. Tr., vol. 2, p. 289.

130. The Debtor was able to produce only the checks in Plaintiff's Exhibit 1 because they were all he could find and the Debtor could not find any checks not produced because they had been lost or destroyed. *Id.* at 282–286.

131. The Debtor recalled beginning to search for responsive documents as soon as he was initially served with the Plaintiff's action. *Id.* at 290.

132. The Debtor admitted to throwing away or losing track of records that related to a Bank One/Chase personal checking account which was used for business purposes because he could not find them when he searched for responsive documents but did not specifically recall disposing of them. *Id.* at 461–463.

133. The Debtor is the owner of Dexter Construction Services LLC. Denial Order, ¶ 2.

134. The Plaintiff received the 2016 Check (a check dated April 30, 2016) from Dexter Construction Services LLC in the amount of $1,000.00. *Id.*

135. The Plaintiff believes that the 2016 Check was made in repayment of the Loan. Amortization Schedule.

136. The Debtor testified that he sent the 2016 Check to the Plaintiff because the Plaintiff had called him to ask for a payment for the Plaintiff's tuition. Tr., vol. 2, pp. 297–298.

137. The Debtor testified that the Plaintiff had requested $2,000.00, but the Debtor sent $1,000.00 because it was the amount he had available to give to the Plaintiff. *Id.* at 300.

138. The Debtor testified that the 2016 Check he made to the Plaintiff was just for the Plaintiff's tuition and was not a repayment on the Loan. *Id.* at 301.

139. Around 2012 or 2013, communication between the Debtor and the Plaintiff stopped. *Id.* at 302–303.

140. The Debtor and the Plaintiff began communicating again early in 2016. *Id.* at 304.

141. The Debtor characterized his contact with the Plaintiff in early 2016 as the Plaintiff "always" calling him and asking for money. *Id.* at 305.

142. The Debtor testified that the 2016 Check was the only time that the Debtor had any money. *Id.* at 305.

143. On February 19, 2016, the Plaintiff texted the Debtor, "I hope Cleveland went well. Has the report been completed? We're hoping to receive a check soon. You also mentioned other endeavors that may help as well. What do you think?" (the "Cleveland Text") *Id.* at 205, Px. 8, p. 62.

144. The Cleveland Text referred to a project the Debtor had worked on in Cleveland that never went through. Tr., vol. 2, p. 306.

145. By 2016, the Debtor did not intend to pay the Plaintiff back for the Loan. *Id.* at 306.

146. The Debtor believed that his obligation to the Plaintiff was discharged in his Chapter 7 Case. *Id.* at 307.

147. The Debtor testified that he continued engaging with the Plaintiff's requests for money during this time period due to a sense of familial obligation and desire to help his cousin. Tr., vol. 2, pp. 364–365, 380–381.

148. The Plaintiff believes that the Note remains due and owing in the amount of $1,116,903.05. Amortization Schedule.

## APPLICABLE LAW

The Operative Counts of the Complaint sound in several areas of law, both state and federal. At its essence, Count I of the Complaint is a straightforward nondischargeability claim, Count V is, as discussed above, a remedy and not really an independent count, Count VI is a state law spoliation claim and Count VII is a state law breach of contract claim. The court will consider the law underlying each of these causes of action, in turn.

### A. Count I: Dischargeability

The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata* (*In re Scarlata*), 979 F.2d 521, 524 (7th Cir. 1992). A creditor must meet this burden by a preponderance of the evidence. The Plaintiff "must establish an exception to

discharge by a preponderance of the evidence." *Banner Oil Co. v. Bryson* (*In re Bryson*), 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995) (Schmetterer, J.) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)). To further the policy of providing a debtor a fresh start, exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *See In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998); *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir. 1994).

To succeed in such an action, first, a plaintiff must establish that the debtor owes him a debt. *Illinois Dept. of Emp. Sec. v. Davis* (*In re Davis*), 668 B.R. 580, 602 (Bankr. N.D. Ill. 2025) (Barnes, J.) (citing to *Zirkel v. Tomlinson* (*In re Tomlinson*), Case Nos. 96 B 27172, 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999) (Katz, J.)).

Second, as section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the dischargeability of debts, a plaintiff must show that the debt falls within one of the specified grounds under section 523(a). *Wachovia Sec., LLC v. Jahelka* (*In re Jahelka*), 442 B.R. 663, 668 (Bankr. N.D. Ill. 2010) (Goldgar, J.). As to this latter element, the Plaintiff has advanced arguments exclusively under section 523(a)(2)(A) of the Bankruptcy Code.

Section 523(a)(2)(A) provides, in pertinent part, that an individual debtor is not discharged from any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition….

11 U.S.C. § 523(a)(2)(A).

It should be noted at the outset that there are essentially two categories of debt that section 523(a)(2)(A) addresses: fraud in the inception of a debt and fraud that extends, renews or refinances a debt. As to the former, fraud in the inception is "fraud that *created* the debt." *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000) (emphasis in original). As to the latter, it should be noted that "a fraudulently induced forbearance does constitute an extension or renewal." *Ojeda v. Goldberg*, 599 F.3d 712, 718 (7th Cir. 2010).

Further, "courts have required the plaintiff to show that the debtor's conduct proximately caused the plaintiff's loss, thus making proximate cause an additional requirement under section 523(a)(2)(A)." *Davis*, 668 B.R. at 600 (citing to *In re Luster*, 50 F. Appx 781, 784 (7th Cir. 2002); *Zirkel v. Tomlinson* (*In re Tomlinson*), Case Nos. 96 B 27172, 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999) (Katz, J.); *Microtech Int'l v. Horwitz* (*In re Horwitz*), 100 B.R. 395, 397-398 (Bankr. N.D. Ill. 1989) (Katz, J.)).

Further still, considering the terms of the statute, three separate grounds for holding a debt to be nondischargeable are included under section 523(a)(2)(A): False pretenses, false representation and actual fraud. *Id.*; *see also Deady v. Hanson* (*In re Hanson*), 432 B.R. 758 (Bankr. N.D. Ill. 2010) (Squires, J.); *Bletnitsky v. Jairath* (*In re Jairath*), 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001) (Goldgar, J.). The court will consider first false pretenses and false representation together, then actual fraud.

1. *False Pretenses and False Representation*

To except a debt from discharge under section 523(a)(2)(A) based on false pretenses or a false representation, the creditor must establish the following elements: (1) the debtor made a false representation or omission of fact; (2) the debtor (a) knew such statement or omission was false or made the same with reckless disregard for its truth and (b) made the same with an intent to deceive; and (3) the creditor justifiably relied on the same. *Reeves v. Davis* (*In re Davis*), 638 F.3d 549, 553 (7th Cir. 2011); *see also Ojeda v. Goldberg*, 599 F.3d 712, 716–17 (7th Cir. 2010); *In re Bero*, 110 F.3d 462, 465 (7th Cir. 1997); *Jahelka*, 442 B.R. at 668–69. A creditor must establish all three elements to support a finding of false pretenses or false representation. *Baermann v. Ryan* (*In re Ryan*), 408 B.R. 143, 156 (Bankr. N.D. Ill. 2009) (Squires, J.); *see also Rae v. Scarpello* (*In re Scarpello*), 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (Squires, J.). Failure to establish any one fact is outcome determinative. *Hanson*, 432 B.R. at 771 (*citing Jairath*, 259 B.R. at 314).

"False pretenses in the context of section 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression." *Media House Productions, Inc. v. Amari* (*In re Amari*), 483 B.R. 836, 846 (Bankr. N.D. Ill. 2012) (Schmetterer, J.) (*citing Sterna v. Paneras* (*In re Paneras*), 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (Squires, J.). The implication arises when a debtor, with the intent to mislead a creditor, engages in "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, . . . or understanding of a transaction, in which [the] creditor is wrongfully induced by [the] debtor to transfer property or extend credit to the debtor . . . ." *Paneras*, 195 B.R. at 406 (internal quotations omitted); *see also Amari*, 483 B.R. at 846.

A false pretense does not necessarily require overt misrepresentations. *Paneras*, 195 B.R. at 406. "Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.*; *see also Hanson*, 432 B.R. at 771 (finding that a false pretense is "established or fostered willfully, knowingly and by design; it is not the result of inadvertence").

In contrast, a false representation is an express misrepresentation that can be demonstrated either by a spoken or written statement or through conduct. *See Scarpello*, 272 B.R. at 700; *In re Philopulos*, 313 B.R. 271, 281 (Bankr. N.D. Ill. 2004) (Schmetterer, J.); *New Austin Roosevelt Currency Exch., Inc. v. Sanchez* (*In re Sanchez*), 277 B.R. 904, 908 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). As a spoken or written statement is not required for a false representation, "[a] debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Hanson*, 432 B.R. at 772 (internal quotation omitted); *see also Scarpello*, 272 B.R. at 700. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Ryan*, 408 B.R. at 157 (*citing Trizna & Lepri v. Malcolm* (*In re Malcolm*), 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992) (Wedoff, J.)).

The Seventh Circuit in the *W.R. Grace* case put a finer point on when an omission can be actionable, stating that:

> The difficult question on liability is whether Grace was required to volunteer to Continental, before the loan closed, the bad news about the Southwest Piney

> Woods field. An omission can of course be actionable as a fraud. But not *every* failure by a seller (or borrower, or employee, etc.) to disclose information to the buyer (or lender, or employer, etc.) that would cause the latter to reassess the deal is actionable. A general duty of disclosure would turn every bargaining relationship into a fiduciary one. There would no longer be such a thing as arm's-length bargaining, and enterprise and commerce would be impeded. The seller who deals at arm's length is entitled to "take advantage" of the buyer at least to the extent of exploiting information and expertise that the seller expended substantial resources of time or money on obtaining—otherwise what incentive would there be to incur such costs? But when the seller has without substantial investment on his part come upon material information which the buyer would find either impossible or very costly to discover himself, then the seller must disclose it—for example, must disclose that the house he is trying to sell is infested with termites. The distinction between the two classes of case is illustrated by *Lenzi v. Morkin*, where the failure to disclose an assessor's valuation was held not to be actionable, since the valuation was a matter of public record and therefore ascertainable by the buyer at reasonable cost.

*Fed. Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 619 (7th Cir. 1989) (citations omitted).

An element common to false representation and false pretense is reliance. The Supreme Court has clarified that section 523(a)(2)(A) requires only a showing of "justifiable" reliance. *See Field v. Mans*, 516 U.S. 59, 73–75 (1995); *see also Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 673 (7th Cir. 1995). Justifiable reliance is a less demanding standard than reasonable reliance and "does not mean that [the creditor's] conduct must conform to the standard of the reasonable man." *Paneras*, 195 B.R. at 406 (*quoting Field*, 516 U.S. at 71). Rather, justifiable reliance "requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Ojeda*, 599 B.R. at 717 (*quoting Field*, 516 U.S. at 71).

Whether a party justifiably relies on a misrepresentation is "determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Id.*; *see also Bombardier Capital, Inc. v. Dobek* (*In re Dobek*), 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002) (Schmetterer, J.). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (Lefkow, J.) (*quoting Field*, 516 U.S. at 70). "However, a plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods." *Fara*, 663 B.R. at 719 (quoting *Johnston v. Campbell* (*In re Campbell*), 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (internal quotations omitted)).

Several courts in this Circuit have determined that "[t]o satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the debtor made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *see also In re Mayer*, 51 F.3d 670, 676 (7th Cir. 1995) ("reliance means the conjunction of a material misrepresentation with causation in fact"); *Hanson*, 432 B.R. at 773. Accordingly, these courts have required the plaintiff to show that the debtor's conduct proximately caused the plaintiff's loss, thus making proximate cause an additional requirement under section 523(a)(2)(A). *See In re Luster*, 50 F. Appx 781, 784 (7th Cir. 2002); *In re Tomlinson*, 1999 WL 294879, at *7; *Microtech Int'l v. Horwitz* (*In re Horwitz*), 100 B.R. 395, 397-398 (Bankr. N.D. Ill. 1989) (Katz, J.).

As noted by the court in *Davis*, the recent Supreme Court case of *Bartenwerfer v. Buckley*, 598 U.S. 69, 77 (2023), has a potential impact upon this analysis. As the court discussed in *Davis*:

> Recently the Supreme Court has clarified that the misrepresentation under section 523 of the Bankruptcy Code goes to how the debt was obtained, not who made the misrepresentation itself. *Bartenwerfer v. Buckley*, 598 U.S. 69, 77 (2023). While this leads to obviously unfair results, making a debtor liable for frauds she had no connection to or knowledge of, that decision binds this court. At first glance, it would appear to call into question the intent precedent discussed above. If a debtor need not even know of the fraud in question, how can a debtor's intent be relevant? *Id.* at 75 ("Passive voice pulls the actor off the stage."). That is, of course, an unfortunate turn of phrase. If intent is an element of fraud, the actor can never truly be off the stage.
>
> Thankfully, *Bartenwerfer* is of little relevance here as the statements in question were those of the Debtor or the Debtor's agent, not some third party. If such statements meet the criteria set forth above, the Debtor may not discharge any personal liability he has to the Plaintiff.
>
> What is clear, though, is this: Whether a plaintiff's reliance is justifiable is still a question for the court, as to hold otherwise would allow a plaintiff to elevate any misrepresentation to the level of nondischargeability. Mere puffery remains inactionable under section 523 of the Bankruptcy Code. *Liebl v. Liebl* (*In re Liebl*), 434 B.R. 529, 539 (Bankr. N.D. Ill. 2010) (Schmetterer, J.). As the Seventh Circuit has stated, "no person of ordinary prudence and comprehension would rely" on such puffery. *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1009 (7th Cir. 2004).

*Davis*, 668 B.R. at 600. As in *Davis*, despite the Plaintiff's initial confusion in that regard, *Bartenwerfer* is simply inapplicable here for its primary holding. The court will nonetheless continue to address the problems created by *Bartenwerfer* generally in this context.

Regarding the Debtor's many promises to repay the Loan, "promises to pay are generally not actionable." *Handler v. Moore* (*In re Moore*), 620 B.R. 617, 629 (Bankr. N.D. Ill. 2020) (Barnes, J.). "A representation about an act to be performed in the future – a promise, in other words – is actionable only if the debtor made the representation with no intention of ever keeping the promise." *Handler v. Delfino*, Case No. 11bk36013, Adv. No. 11ap01891 (Bankr. N.D. Ill. filed Sept. 14, 2011) (Goldgar, J.) (citing to *Perlman v. Zell*, 185 F.3d 850, 852 (7th Cir. 1999)). "[W[hile a promise to pay alone, in and of itself, is not actionable, statements regarding resources to repay may be and promises made without the intention of ever keeping them may also suffice." *Moore*, 620 B.R. at 630. An allegation of source of funds to repay a loan might be actionable if specific and if intended to cause a creditor to forbear on collection when repayment was never intended. *See, e.g.*, *In re Yotis*, 521 B.R. 625, 637 (Bankr. N.D. Ill. 2014) (Schmetterer, J.); *see also, e.g.*, Order Determining Dischargeability of Debt, at p. 9, ¶ F [Adv. Dkt. No. 175 in *Handler v. Burkhart*, Case No. 14bk24345, Adv. No. 14ap00699 (Bankr. N.D. Ill. filed Sept. 25, 2014) (Cassling, J.).

2. *Actual Fraud*

A different analysis is used when a creditor alleges actual fraud. In order to except a debt from discharge on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. *Jahelka*, 442 B.R. at 669; *see also Ryan*, 408 B.R. at 157; *Scarpello*, 272 B.R. at 701; *Jairath*, 259 B.R. 308, 314. The fraud exception to the dischargeability of debts in bankruptcy does not reach constructive frauds, only actual ones. *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000); *see also Ryan*, 408 B.R. at 157.

Unlike false pretenses and false representations, "actual fraud" does not require proof of a misrepresentation or reliance. *McClellan*, 217 F.3d at 892; *see also Jahelka*, 442 B.R. at 669; *Hanson*, 432 B.R. at 771. While there is no definite rule defining fraud, "it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (internal quotations omitted). It is important to note that not all broken promises constitute fraud. Without the fraud, a broken promise is simply a breach of contract. *United States ex rel. Main v. Oakland City University,* 426 F.3d 914, 917 (7th Cir. 2005) ("failure to honor one's promise is (just) breach of contract, but making a promise that one *intends* not to keep is fraud") (emphasis in original).

As this court has previously noted, it appears that *Bartenwerfer* might negatively affect this analysis as well. Again, if a debtor need not even know of a fraud, *Bartenwerfer*, 598 U.S. at 75, a debtor's intent to defraud is hardly relevant except as is necessary to establish the fraud itself. Once again, though, the facts make clear that if a fraud existed, it was one implemented by the Debtor. Thankfully then, *Bartenwerfer* is of no impact on this factor in this matter.

3. *Intent*

Regarding the element of intent, the court adopts its discussion in *Davis*, as follows:

> As is noted above, *Bartenwerfer* calls into question years of jurisprudence regarding a debtor's intent in relation to section 523 of the Bankruptcy Code. Scienter, or intent to deceive, has been for decades a required element under section 523(a)(2)(A) for proving whether the claim is for a false representation, false pretenses, or actual fraud. *Mayer v. Spanel Int'l, Ltd.* (*In re Mayer*), 51 F.3d 670, 673 (7th Cir. 1995), *cert. denied*, 516 U.S. 1008 (1995); *Pearson v. Howard* (*In re Howard*), 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006) (Schwartz, J.). Intent to deceive is measured by the debtor's subjective intention at the time of the representations or other purportedly fraudulent conduct. *See Scarpello*, 272 B.R. at 700; *see also CFC Wireforms v. Monroe* (*In re Monroe*), 304 B.R. 349, 356 (Bankr. N.D Ill. 2004) (Schmetterer, J.). Subsequent acts of fraud or omissions do not demonstrate that the debtor had the requisite intent at the time the representations were made. *Standard Bank & Trust Co. v. Iaquinta* (*In re Iaquinta*), 95 B.R. 576, 578 (Bankr. N.D. Ill. 1989) (Squires, J.).
>
> An intent to deceive may be established through direct evidence or inference. *Monroe*, 304 B.R. at 356 (*citing In re Sheridan*, 57 F.3d 627 (7th Cir. 1995)). Because direct proof of fraudulent intent is often unavailable, fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred

when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan* (*In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (Cox, J.) (internal quotations omitted); *see also Hanson*, 432 B.R. at 773. Thus, "[w]here a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315.

As noted above, while *Bartenwerfer* removes intent as an independent element of any section 523 analysis, thereby prohibiting debtors from discharging debts arising from frauds which they knew nothing of and had no connection to, *Bartenwerfer* does not remove intent insofar as it is needed to establish the existence of a fraud. In this context, the fraud in question is actual fraud, not constructive or implied fraud. As the Supreme Court has stated,

> "[a]ctual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Id. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."*

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (emphasis added).

Thus, following the Supreme Court's non-*Bartenwerfer* jurisprudence means that intent remains an element of actual fraud, though it may no longer be one under misrepresentation. This has the effect of making the standard for misrepresentation easier to meet than that of actual fraud, which one might expect, but thereby making debtors liable for the more innocuous of statements than for more egregious conduct, which one might not. The result is a whole host of "soft" frauds will be nondischargeable, which appears to be what the Supreme Court intended.

In *Husky*, Justice Sotomayor stated further, "[a]lthough 'fraud' connotes deception or trickery generally, the term is difficult to define more precisely." *Id.* "There is no need to adopt a definition for all times and all circumstances here because, from the beginning of English bankruptcy practice, courts and legislatures have used the term 'fraud' to describe a debtor's transfer of assets that … impairs a creditor's ability to collect the debt." *Id.*

Thus, under section 523(a)(2)(A), fraud, while not precisely defined, is best taken as some sort of intentional act of deception which impairs a creditor's ability to collect a debt, including a fraudulent transfer or conveyance scheme. *Id.* at 366.

*Davis*, 668 B.R. at 600–02.

As the court noted above, all the foregoing is predicated on there being a debt. As that discussion in subsumed into the discussions of Counts VI and VII, below, the court defers that discussion until that point.

B. Count V: Constructive Trust

In Illinois, a "'constructive trust' is a remedy and not a stand-alone cause of action." *Infinity Trans. 2024, LLC v. Ras Data Servs., Inc.* (*In re Ras Data Servs., Inc.*), 677 B.R. 250, 268 (Bankr. N.D. Ill. 2026) (Slade, J.). It is "an extraordinary equitable remedy, to be used sparingly." *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 305 (7th Cir. 2014). As the Seventh Circuit stated in *Mississippi Valley Livestock*,

> In Illinois, as in most states, the remedy is appropriate "[w]hen a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it ... to avoid unjust enrichment." *Smithberg v. Ill. Mun. Ret. Fund,* 192 Ill.2d 291, 248 Ill.Dec. 909, 735 N.E.2d 560, 565 (2000); *see also* Restatement (First) of Restitution § 160 (1937) ("Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.").

*Id.*

Should a constructive trust be imposed by the court, a decision which under Illinois law is left to the court's discretion, *Legacy Re, Ltd. v. 401 Props. Ltd. P'ship*, 2026 IL App (1st) 241341, ¶ 28 ("The imposition of a constructive trust … is also generally a matter for the trial court's discretion and, as such, will be reversed only for an abuse of that discretion."), that might defeat the claims of creditors of the bankruptcy estate. *Mississippi Valley Livestock*, 745 F.3d at 305 ("the constructive trust can subvert bankruptcy's distribution scheme").

While the Illinois courts have been somewhat parsimonious in their explanations of when and how a constructive trust might be applied, one thing that is clear is that there must be some "wrongful conduct" from which proceeds have arisen and may be identified. *Indeck Energy Servs., Inc. v. DePodesta*, 2021 IL 125733, ¶ 60.

C. Count VI: Spoliation

In Count VI, the Plaintiff argues that the Defendants have failed to preserve evidence essential to prove the Plaintiff's claims and recoveries. As noted above, however, the Plaintiff has abandoned this Count as to Defendant Spretnjak. As a result, this Count applies only to the Debtor.

The Illinois Supreme Court has noted that, in general, there is "no duty to preserve evidence; however, a duty to preserve evidence may arise through an agreement, a contract, a statute or another special circumstance." *Boyd*, 166 Ill. 2d at 195 (citation omitted). "Illinois courts … 'have not precisely defined a "special circumstance" in the context of recognizing a duty in a spoliation of evidence claim.'" *Carroll v. ThyssenKrupp Elevator Corp.*, Case No. 20 C 6699, 2023 WL 5431285, at *10 (N.D. Ill. Aug. 23, 2023). As the District Court in *Carroll* stated, "what courts have done is established that mere possession and control of the evidence is not a special circumstance, even if the plaintiffs have essentially no opportunity to request that the evidence be preserved. Likewise,

neither the employer-employee relationship nor status as a potential litigant creates a 'special circumstance.'" *Id.* (citing to *Martin v. Keeley & Sons, Inc.*, 2012 IL 113270, ¶¶ 44-51).

Under applicable Illinois law, spoliation is not an independent cause of action but rather sounds in negligence. PSJ Order, p. 9 (*citing to Boyd*, 166 Ill.2d at 192–93). The court found, however, that the Complaint did sound in negligence and thus declined to render summary judgment on Count VI. *Id.* The only Counts that could have been so interpreted are Counts I, II and IV. As Counts I and IV pertained to Defendant Spretnjak and Defendant Spretnjak has prevailed on those counts, *id.* at p. 8, what is left then, for spoliation to apply, is for the Court to find that the factors set forth above have hindered the Plaintiff's claims or recoveries under Count I.

> To establish negligence under Illinois law, a plaintiff must show that the defendant owed him "a duty of care, that it breached that duty, and that the breach proximately caused his injuries." *Smith v. United States*, 860 F.3d 995, 998 (7th Cir. 2017) (citing *Calles v. Scripto-Tokai Corp.*, 224 Ill.2d 247, 309 Ill.Dec. 383, 864 N.E.2d 249, 270 (2007)).

*Khouri v. Highland Park CVS, LLC*, 178 F.4th 391, 397–98 (7th Cir. 2026). As noted above, however, absent special circumstances, there is no duty between parties opposite one another in a commercial transaction. *W.R. Grace & Co.*, 877 F.2d at 619.

It should also be noted that in pleading Count VI, the Plaintiff makes passing reference to section 727(a) of the Bankruptcy Code. Complaint at ¶ 98. So too does the Plaintiff's Pretrial Brief. Plaintiff's Pretrial Brief at p. 6 (incorrectly citing to "section 727(3)," a provision of the statute that does not exist). Section 727(a)(3) would result in the denial of a debtor's discharge should the court find that

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

As the Seventh Circuit has stated, "[s]ection 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.'" *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (quoting *Bay State Milling Co. v. Martin* (*In re Martin*), 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992) (Schmetterer, J.). This court held that where a plaintiff has failed to show "that the absence of books and records had any bearing on the administration of that case," an action under section 727(a)(3) fails. *Schaumburg Bank & Trust Co., N.A. v. Hartford* (*In re Hartford*), 525 B.R. 895, 912 (Bankr. N.D. Ill. 2015) (Barnes, J.).

D. <u>Count VII: The Debt</u>

In Count VII of the Complaint, the Plaintiff makes two actionable arguments. First, the Plaintiff argues that the Debtor has violated the terms of the Note by failing to repay it and by

failing to use the Loan proceeds for the Ellis Property as intended. Second, the Plaintiff argues that the Debtor made various false or misleading statements to the Plaintiff in order to cause the Plaintiff to forebear from acting earlier to collect on the Loan.

As to the first argument, a breach of a loan covenant is no different than a breach of the repayment provisions of the Loan. Each result in a claim against the borrower. *Accord Home Sav. Ass'n of Kansas City, F.A. v. State Bank of Woodstock*, 763 F. Supp. 292, 299 (N.D. Ill. 1991) (regarding a loan provision that required the loan proceeds "be used only for this project").

Here, the Debtor has admitted Count VII insofar as he has admitted to not having repaid the Loan when due. *See* #16 of Statement of Stipulated Facts in Defendants' Pretrial Statement ("Christopher defaulted on the note by December 31, 2006, as he did not pay back the $150,000 loan in full. Default interest began to accrue at 52.2%."). It does not, therefore, matter for the purposes of Count VII, whether the Debtor failed to use the Loan proceeds for the Ellis Property. That would simply be another breach of contract claim. A claim is a claim for the purposes of Count VII and the Debtor has admitted that the Plaintiff has a claim.

As to the various false or misleading statements alleged by the Plaintiff, they have little bearing on Count VII for the same reason. They will be taken up in the context of Count I.

## DISCUSSION

### A. The Essence of the Plaintiff's Action

Considering all of the foregoing, it is necessary to take stock of the Plaintiff's essential allegations against the Defendants. The Plaintiff loaned money to the Debtor which was not entirely repaid. As a result, the Plaintiff is owed a debt from the Debtor. That much is clear.

The Plaintiff has alleged he was defrauded by the Debtor. What was the fraud? The Plaintiff alleges a number of potential misdeeds by the Debtor, most of which appear to have no bearing on the Loan, the Note, the debt owed to Plaintiff or its repayment. The Plaintiff has not shown any actual misrepresentations by the Debtor and has not convincingly alleged any duty of the Debtor to disclose to the Plaintiff these various allegations. The testimony attempts to demonstrate that the Plaintiff would not have made the Loan absent such disclosure. The facts adduced as Trial evidence, however, demonstrate that the Plaintiff either was or should have been aware that the Loan was troubled from the outset yet proceeded regardless without any apparent diligence. The evidence does not support the Plaintiff's claims. Even accepting the Plaintiff's allegations regarding the Debtor's conduct as true, the Plaintiff's case still comes up short. Further, though a closer call, the Plaintiff has failed to show that any spoliation of the evidence has affected this result.

The court will consider each of the Counts in turn, though will reserve its discussion on Count V for the end as it hinges on the success of Count VII.

#### 1. *Count I – 523(a)(2)(A)*

As noted above, for a debt to be nondischargeable under section 523(a)(2)(A), a plaintiff must show that she justifiably relied on a material misrepresentation that was the cause in fact of the debt sought to be excepted from discharge or that the debt in question arose out of fraud. 11 U.S.C. § 523(a)(2)(A). The court will consider each, in turn.

a. The Alleged Misrepresentations and the Plaintiff's Reliance on the Same

The Plaintiff alleges two essential categories of misrepresentation by the Debtor: (1) Fraud in the inception – lies and omissions that caused the Plaintiff to extend the Loan; and (2) Lies and omissions that caused the Plaintiff to forbear from collecting on the Loan.

The Plaintiff alleges that the Defendants induced the Plaintiff to make the Loan with a false pretense of promising to repay it because the Defendants never intended to repay the Plaintiff. Complaint, ¶¶ 19–22. The Plaintiff alleges that the Debtor told the Plaintiff that the purpose of the Loan was to convert the heating at the Ellis Property from gas to electric while failing to disclose to the Plaintiff that Defendants were "heating 8000 S. Ellis by stealing natural gas," a circumstance that would have prevented the Plaintiff from making the Loan, had he been aware of it. *Id.* at ¶ 24. The Plaintiff further alleges that the Defendants induced him to make the Loan with a false representation that "8000 S. Ellis was a large building" and he would not have made the loan had he known the actual number of units at 8000 S. Ellis. *Id.* at ¶ 25. The Plaintiff also alleges misrepresentation in that he extended the Loan under the false pretense that the Defendants intended to use the proceeds of the Loan only for improvements to the Ellis Property, but the Defendants actually intended to and did use the proceeds for their personal use, including to repay another creditor with an interest in the Ellis Property, and the Plaintiff never would have made the Loan had he been aware that the Defendants "intended to use the loan to repay another creditor instead of repaying Plaintiff." *Id.* at ¶¶ 26–28.

The Plaintiff also alleges that the Loan was made under false pretenses because the Defendants did not disclose an earlier loan from a different family member and the Plaintiff would not have made the Loan had he been aware of the prior loan. *Id.* at ¶ 29. Finally, the Plaintiff alleges that the Loan was induced by misrepresentation to the extent that the Defendants "held themselves out as legitimate business owners who were borrowing half of Plaintiff's net worth for a legitimate and honest business purpose" while the Defendants actually intended to "use 8000 S. Ellis as a scam, as bait to attract lenders so that Defendants could pocket the money for their personal use." *Id.* at ¶ 30.

The problem with the former theory is that the Plaintiff has failed to show that he justifiably relied on any material misrepresentation that was the cause in fact of the debt sought to be excepted from discharge. *Davis*, 638 F.3d at 553; *Ojeda*, 599 F.3d at 716–17. By the same token, while the Plaintiff has pointed to a number of factors he wished he had known prior to making the Loan, he has failed to show how those factors were material to the Loan. *Mayer*, 51 F.3d at 676; *Hanson*, 432 B.R. at 772; *Scarpello*, 272 B.R. at 700. Further, the Plaintiff has shown no duty on behalf of the Debtor to make the representations the Plaintiff had wished for. *W.R. Grace*, 877 F.2d at 619. By all of the evidence, the Loan was an arms' length personal loan between cousins. Though the Loan contained one reference to the use of proceeds on the Ellis Property, it was otherwise unconnected to the Ellis Property or the Debtor's businesses. Nothing with the Loan or the Note connected repayment of the Loan to the success or failure of the Ellis Property. The only collateral on the Note was personal to the Debtor, his Home. At best, the court might infer that the success of the Debtor's businesses would have afforded the Debtor a better opportunity to repay the Loan. But such an inference is not enough.

The Plaintiff attempts to place a duty to disclose on the Debtor where no such duty existed. *Id.* Further, the evidence that was adduced instead shows the Plaintiff blindly made the loan,

sticking his head in the sand on a transaction that clearly had the *indicia* of a troubled loan. This a plaintiff simply cannot do. *Field*, 516 U.S. at 71; *Fara*, 663 B.R. at 719; *Ojeda*, 599 B.R. at 717; *Campbell*, 372 B.R. at 892. For example, the Plaintiff has failed to show that he did any due diligence on the Loan prior to making it, even admitting that he "had never visited 8000 S. Ellis prior to the loan." *Id.* at ¶ 25. Had the Plaintiff simply visited the Ellis Property prior to making the Loan, he would have been aware of the size of the building. There was no evidence of any diligence on account of the Plaintiff.

Further, the Plaintiff has failed to show that the Defendants never intended to repay the Loan. Neither has the Plaintiff shown that the Defendants actually intended to use the proceeds of the Loan for their own personal use, let alone how repayment of another creditor with an interest in the Ellis Property could be characterized as being for their own personal use. Further, the Plaintiff has failed to show that the Loan proceeds were *not* used to make improvements at the Ellis Property, including with respect to the heat conversion. To the contrary, the evidence shows that the Debtor did intend to repay the Plaintiff and in fact made significant efforts toward repayment. As noted in the findings above, prior to the Loan being discharged in the above-captioned case, the Debtor paid interest in the amount of $109,252.50 and a total amount of $13,832.50 in relation to the Loan. *Szafron v. Wielogosinski* (*In re Wielogosinski*), Case No. 18 B 22666, 2021 WL 1234455 (Bankr. N.D. Ill. Mar. 24, 2021) (Hunt, J.) ("Conduct that reflects a good faith attempt to perform 'generally suggests a lack of fraudulent intent.'") (quoting *Parkway Bank & Trust Co. v. Casali (In re Casali)*, 547 B.R. 263, 271 (Bankr. N.D. Ill. 2016) (Schmetterer, J.).

The evidence does not show that the proceeds were used for the Defendants' personal use or benefit. The evidence makes clear that the heat conversion was completed at the Ellis Property and funds were used for repair there and at the other Properties. But the lack of evidence is immaterial. Even if evidence of personal use existed, it would simply amount to another breach of the contract between the parties. That breach is not fraud. *W.R. Grace*, 877 F.2d at 619. Nothing shows that the Loan was obtained under false pretenses, false misrepresentation or actual fraud.

While the Plaintiff makes much of the alleged stealing of gas at the Ellis Property, the Plaintiff has failed to make any connection between that allegation and the default on the Loan. The court sees neither cause nor effect in relation to the gas stealing allegations. *Luster*, 50 F. Appx at 784; *Davis*, 668 B.R. at 600. True, the People's Gas Judgment did give rise to a significant debt. But the People's Gas Judgment was rendered after the making of the Loan and preceded the Chapter 7 Case by more than five years. Further, it is unclear whether the People's Gas Judgment was in fact for stealing gas, simple nonpayment (the gas was, after all, shut off for a reason) or something else. In short, no causal connection has been shown between the loss of the Debtor's businesses, the Ellis Property and the Home and the gas stealing allegations. Even if the gas stealing did occur, the Plaintiff has failed to show how that that was in any way was the proximate cause of any of his injuries. *Luster*, 50 F. Appx at 784; *Davis*, 668 B.R. at 600. If this is instead about disclosure, even if these allegations were true, the Plaintiff has shown no duty on behalf of the Debtor to disclose anything regarding these allegations. *W.R. Grace*, 877 F.2d at 619. Instead, the Plaintiff's argument strikes the court as an attempt to show that the Debtor has a propensity to commit fraud and thus would likely have committed fraud in relation to the Loan. That sort of strategy is strictly prohibited by the Federal Rules of Evidence. *See* Fed. R. Evid. 401(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").

The gas stealing allegations also appear to have nothing to do with the Plaintiff's failure to be notified of the Home's foreclosure. Such notice is not the Debtor's, but the foreclosing party's responsibility. 735 ILCS 15/1501. While failure to notify the Plaintiff in that foreclosure might give rise to a claim by the Plaintiff against the foreclosing party, it does redound upon the Debtor. The loss of the Plaintiff's interest in the Home (if that did in fact occur under Illinois law, given the alleged lack of notice), was a result of the foreclosure.

The evidence clearly demonstrated that the Loan was a distressed one. The extraordinarily high interest rate is just one factor. The Plaintiff, who wishes the court to believe that the Loan was a business loan, did no diligence on the Debtor or his businesses, added no covenants regarding the operation of the businesses and did nothing that the court can determine to police the Loan after it was made. Rather than take a lien on the Ellis Property, which would have connected the Loan more firmly to it, the Plaintiff instead took a lien on the Debtor's Home. The court simply does not believe that the Plaintiff was unaware that the Loan was a risky one.

This theory therefore fails.

As to the latter, though not well articulated, the Plaintiff appears to be arguing that the Debtor's lies or omissions caused the Plaintiff to forbear from collecting on the Note. The court has carefully examined the communications between the parties and has found nothing actionable in them. Recall that reliance in the form of forbearance might be justifiable and actionable if made without the actual intent to repay, *Perlman*, 185 F.3d at 852; *Handler*, Case No. 11bk36013, Adv. No. 11ap01891, such promises to pay are generally not actionable. *Moore*, 620 B.R. at 629. There simply is no evidence that the Debtor made any representations to the Plaintiff regarding repayment that he did not intend to keep. Failing to keep such a promise alone is not enough. Once again, this theory reflects a mere dispute between the Plaintiff and the Debtor under the Loan and regarding payments outside the contract. *Saltzman*, 1998 WL 152987, at *4.

The court cannot conclude that the Debtor or anyone at the Debtor's behest materially misrepresented anything. This theory also fails.

b. Fraud

The Plaintiff's fraud claim fares no better. Recall that, to establish fraud, a plaintiff must show that (1) a fraud occurred, (2) the debtor intended to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. *Jahelka*, 442 B.R. at 669.

Here, the court has not been convinced that a fraud occurred. For the same reasons that the court cannot find a misrepresentation, there simply is not the *indicia* of fraud here that the Plaintiff would need to succeed. The court sees no surprise, trick, cunning, dissembling or unfair act cheating the Plaintiff out of what he was due. *McClellan*, 217 F.3d at 893. There is no indication of bad faith or immorality. *Husky*, 578 U.S. at 360. At best, the court would have to impute the same and that, as the Supreme Court made clear, is not within the purview of actual fraud. *Id.* (the court must find "acts of deception that 'may exist without the imputation of bad faith or immorality.'").

The Plaintiff has not alleged any duty of the Debtor to disclose with respect to the Plaintiff's various allegations, nor does one generally exist in arms' length transactions under Illinois law. *W.R. Grace*, 877 F.2d at 619. What is clear is that the Plaintiff was aware, or should have been aware, that

the Loan was troubled from the outset. Any misrepresentation by omission here was where the Debtor had no duty of disclosure and where the Plaintiff has stuck his head in the sand. *Id.*; *Field*, 516 U.S. at 71; *Fara*, 663 B.R. at 719; *Ojeda*, 599 B.R. at 717; *Campbell*, 372 B.R. at 892.

As a result, this theory also fails and Count I fails in its entirety. Any debt owed by the Debtor to the Plaintiff arising from the Loan and the Note is dischargeable and was discharged in the above-captioned case.

2. *Count VI - Spoliation*

The much harder questions arise with respect to spoliation. Harder, not because the evidence makes a case for spoliation clear, but rather because the temptation is for the court to speculate as to what might have been different had the facts of this matter been different.

A spoliation analysis, however, begins with the fundamentals. As this court has noted, under Illinois law, there is "no duty to preserve evidence; however, a duty to preserve evidence may arise through an agreement, a contract, a statute or another special circumstance." *Boyd*, 166 Ill. 2d at 195 (citation omitted). Mere possession and control of evidence is not enough. *Carroll*, 2023 WL 5431285, at *10. This is true even if "the plaintiffs have essentially no opportunity to request that the evidence be preserved." *Id.*; *Martin*, 2012 IL 113270, ¶¶ 44-51.

Under applicable Illinois law, spoliation is not an independent cause of action but rather sounds in negligence. PSJ Order, p. 9 (*citing to Boyd*, 166 Ill.2d at 192–93). While this court found that the Complaint did sound in negligence, *id.*, as discussed above, the only Count that remained for Trial was Count I. The court has, however, ruled in favor of the Debtor on Count I.

This is where the court is left to speculate whether the ruling on Count I might have been different had the evidence been more fulsome. Put another way: Were the Plaintiff's claims or recoveries under Count I hindered by some spoliation of the evidence?

The court does not find this be the case.

First, as noted above, "to establish negligence under Illinois law, a plaintiff must show that the defendant owed him 'a duty of care, that it breached that duty, and that the breach proximately caused his injuries.'" *Khouri*, 178 F.4th at 397–98. Absent such a duty, which does not exist under Illinois law between parties opposite one another in a commercial transaction, *W.R. Grace & Co.*, 877 F.2d at 619, there can be no negligence and therefore there can be no spoliation. As no duty exists here under Illinois law, there can be no spoliation claim in that regard as there can be no negligence.

Does federal law, however, change this result? As noted above, the Plaintiff makes passing reference to section 727(a) of the Bankruptcy Code.

Section 727(a)(3) would result in the denial of a debtor's discharge should the court find that

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained,

> unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

As the Seventh Circuit has stated, "[s]ection 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.'" *In re Juzwiak*, 89 F.3d at 427 (quoting *Bay State Milling Co. v. Martin* (*In re Martin*), 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992) (Schmetterer, J.). This court held that where a plaintiff has failed to show "that the absence of books and records had any bearing on the administration of that case," an action under section 727(a)(3) fails. *Schaumburg Bank & Trust Co., N.A. v. Hartford* (*In re Hartford*), 525 B.R. 895, 912 (Bankr. N.D. Ill. 2015) (Barnes, J.).

Here, it is important to note again that the Plaintiff has all but abandoned this argument. Other than the passing references noted above, the Plaintiff has done nothing to further this argument. He has presented no evidence that the absence of books and records had any bearing on the administration of that case. Instead, the docket of the case indicates clearly that the chapter 7 trustee fully administered the case, finding no assets available to pay creditors. Chapter 7 Trustee's Report of No Distribution [Dkt. No. 17]. As noted above, the Debtor thereafter was granted a discharge. Discharge [Dkt. No. 29]. It was only after that point that the Debtor disposed of his records.

The Seventh Circuit has instructed the bankruptcy courts to construe "exceptions to discharge … strictly against the creditor and liberally in favor of the debtor." *In re Juzwiak*, 89 F.3d at 427. In a case where the creditor has made only tangential references to section 727 and the underlying case was administered without any apparent difficulty, the court simply cannot conclude that the Debtor has failed in his duty thereunder. So, whether or not the duty under section 727 would extend to these circumstances to satisfy the standards of negligence, as no breach of that duty can be determined, the negligence claim must fail.

For each of the foregoing reasons, the court cannot conclude that the Plaintiff has succeeded in establishing his case for spoliation under the standards set forth in the law. As a result, Count VI must fail.

3. *Count VII - Breach of Contract*

Ostensibly, Count VII is fairly simple. Count VII, pled for the first time in the Fourth Amended Adversary Complaint and only against the Debtor, seeks breach of contract damages under Illinois law. Recall that in answering Count VII, the Debtor admitted to defaulting on the Note by failing to make timely payments and asserted that said breach of contract claim is barred by the ten-year statute of limitations because the breach occurred in December 2006 and the lawsuit was first filed in 2019. Count VII Answer, ¶ 106.

The Debtor has admitted Count VII insofar as the Debtor has admitted to not having repaid the Loan when due. *See* #16 of Statement of Stipulated Facts in Defendants' Pretrial Statement ("Christopher defaulted on the note by December 31, 2006, as he did not pay back the $150,000 loan in full. Default interest began to accrue at 52.2%.").

The Debtor has, however, argued in the Sixth Motion to Dismiss that the statute of limitations has run on Count VII. The initial facts on that statute of limitations are clear. The court must therefore consider the statute of limitations first.

a. The Statute of Limitations

The applicable statute of limitations is the ten-year statute of limitations for actions on written contracts, promissory notes, bonds and written leases. 735 ILCS 5/13-206. The statute provides that the ten-year period begins to run when the "cause of action first accrued." *Id.*

When did the Plaintiff's cause of action first accrue? There are a number of possible triggering dates. First, the maturity date of the Note can be used. *Id.* ("a cause of action on a promissory note payable at a definite date accrues on the due date or date stated in the promissory note"). That would make the last day to commence the action December 31, 2016. Second, as regular, monthly interest payments were due under the express terms of the Note, the action may have accrued when the Debtor first failed to make such regular payments. According to the Plaintiff's Amortization Schedule, that would have been the first month following the execution of the Note on December 31, 2006, as the Debtor made no payment of any kind until April 11, 2007. Amortization Schedule. That would make the last day to commence the action April 11, 2017. Third, per the terms of the statute, the last payment of the Debtor per the Amortization Schedule was on March 20, 2009, 735 ILCS 5/13-206 ("if any payment … has been made, … within or after the period of 10 years, then an action may be commenced thereon at any time within 10 years after the time of such payment …."). That would make the last day to commence the action March 20, 2019.

Under these first three possibilities, the latest date under which the Plaintiff's cause of action could have been brought, therefore, is March 20, 2019. The Adversary, however, was not commenced until September 8, 2020. Were that the only factor, therefore, the cause of action on Count VII would be time barred. The Adversary, however, consolidates into it the removed State Court Proceeding. That proceeding was commenced on November 12, 2019. As that date is also outside of the ten-year limitations period, that too would result in Count VII being time barred.

There is, however, one additional factor. Recall that there was the 2016 Check from Dexter Construction Services LLC to the Plaintiff in the amount of $1,000.00. Denial Order, ¶ 2. Recall also that the Debtor is the owner of Dexter Construction Services LLC. The Plaintiff argues that the 2016 Check, made on April 30, 2016, extended the statute of limitations for another ten years. 735 ILCS 5/13-206 ("if any payment … has been made, … within *or after the period of 10 years,* then an action may be commenced thereon at any time within 10 years after the time of such payment ….") (emphasis added).

The court declined to rule on this issue when considering the Sixth Motion to Dismiss, finding that the intent behind the 2016 Check was a material fact in dispute that necessitated a trial. As the 2016 Check might not have been intended by the Debtor as a repayment on the Loan, the mere fact that a check was sent was not enough to establish intent and thus the matter could not be determined on a motion to dismiss. Denial Order, ¶ 1.

Now, having considered the testimony of both the Plaintiff and the Debtor, the court is convinced that the 2016 Check was intended as a repayment of the Loan. Though the Debtor

expressly disclaims that intent, his testimony in that regard was simply not believable and the circumstances around the payment do not support his contention that this was, for example, simply a charitable act on his behalf. There was no convincing reason for the Debtor to cause the 2016 Check to be made, especially given the parties' less-than-amicable relationship after the Debtor ceased making payments in 2009.

The court finds that the 2016 Check was a repayment of the Loan. Thus, the statute of limitations on Count VII was extended thereby and both the State Court Proceeding and the Adversary proceeding fall within the time period under which such an action is allowed. Count VII is timely.

b. The Debt

What remains is relatively simple. The Debtor has admitted that he breached the terms of the Note and that the Loan remains unpaid. The Plaintiff has provided a calculation of the amounts due in the Amortization Schedule. The Amortization Schedule was admitted into evidence and the Debtor has failed to offer evidence to rebut that calculation.

As a result, the court is guided by the only evidence it has to the following result: Absent the Chapter 7 Case, the amount owed by the Plaintiff to the Debtor would have been $1,116,903.05 on April 30, 2021. Amortization Schedule. Even accepting the usurious interest rate, that number won't do, however.

The Chapter 7 Case was commenced on the Petition Date, May 16, 2014. The House was long since foreclosed upon by that date. Recall that the Debtor and Vicky stopped talking in 2009 as a result of Vicky informing the Plaintiff of the foreclosures.[11] Even secured creditors in bankruptcy are not automatically entitled to postpetition interest. 11 U.S.C. § 502(b)(2); *In re Rosebud Farm, Inc.*, 660 B.R. 222, 249 (Bankr. N.D. Ill. 2024) (Barnes, J.), *aff'd sub nom. Longo & Assocs., Ltd. v. Moglia as trustee for Rosebud Farm, Inc.*, No. 18 B 24763, 2025 WL 849615 (N.D. Ill. Mar. 18, 2025).

Here, however, where the only collateral for the Note was gone in advance of the commencement of the Chapter 7 Case and the Plaintiff's ability to claim interest against the Debtor's bankruptcy estate ceased at that time. 11 U.S.C. § 502(b)(2); 11 U.S.C. § 506(a); *Rosebud Farm*, 660 B.R. at 282.

The Amortization Schedule does not, however, provide a calculation as to the Petition Date. As best as the court can determine based on the Amortization Schedule, the daily interest accrued after March 20, 2009 (the last date prior to the Petition Date when the Amortization Schedule provides a balance) on the Loan would be $349.29 (calculated based on the annual interest rate of 52.2% divided by 365). There are, by the court's calculation, 1,883 dates between March 20, 2009, and the Petition Date of May 16, 2014. That daily interest, plus the balance on March 20, 2009, of $244,233.33 per the Amortization Schedule results in a total loan balance of $901,940.97.

---

11 It is entirely unclear why the Plaintiff, so informed at that time, took no action to enforce the Note or the Loan at that time, as this also roughly coincides with the last payment other than the 2016 Check made by the Debtor to the Plaintiff.

The total amount of the Plaintiff's claim could, therefore, be $901,940.97. The court, however, will not make such a judgment at this time, for two reasons.

First, the calculation above is too far extrapolated from the Amortization Schedule. The Plaintiff should be afforded an opportunity, should he so desire, to provide evidence of the amount owed as of the Petition Date. While the Amortization Schedule is in evidence and the court has no contrary evidence in that regard, the court wishes to hear from each of the parties on the actual number.

Second, and perhaps more important, is that this calculation is academic in light of the court's rulings herein. As the court has determined the Plaintiff's claim, no matter now calculated, is dischargeable and as the Debtor's case was a no asset chapter 7 case, there is simply no point in determining this amount specifically. The Plaintiff's claim against the Debtor, no matter what it may be, is discharged.

4. *Count V - Constructive Trust*

As the Plaintiff has succeeded on Count VII, it is possible that the Plaintiff could establish a case for constructive trust as a remedy under Illinois law. The Plaintiff, however, has failed to do so.

While the Plaintiff has shown that Debtor owes him a debt, he has not shown that the debt was incurred under such circumstances that equity and good conscience would afford the Plaintiff here a remedy in constructive trust. The Plaintiff has pointed to no property of the Debtor traceable to the Loan's proceeds as a result of a wrongful conduct. *Indeck*, 2021 IL 125733, ¶ 60.

Constructive trust is an "extraordinary equitable remedy, to be used sparingly." *Mississippi Valley Livestock*, 745 F.3d at 305. Its application is left to the court's discretion. *Legacy Re*, 2026 IL App (1st) 241341, ¶ 28.

If the foreclosure of the Home occurred without notice to the Plaintiff, that might afford the Plaintiff some rights against the bank. It does not, however, result in a remedy against the Debtor or his property. The court sees no other reason to apply the extraordinary remedy of constructive trust under the overall circumstances discussed in this Memorandum Opinion. Count V, therefore, fails.

CONCLUSION

For the reasons stated above, judgment will be entered in favor of the Debtor on Count I and Count II of the Amended Complaint. As Count III of the Amended Complaint was previously dismissed, this judgment concludes the Adversary.

Dated: September 11, 2026

ENTERED:



Judge Timothy A. Barnes
United States Bankruptcy Court